SICKLESTEEL vs. EDMONDS and another, Appellants, and LORENZE, Respondent.

SICKLESTEEL vs. EDMONDS and another, Respondents, and LORENZE, Appellant.

*May 2—October 6, 1914.*

*Joint adventures: Subscription for purchase of land: Liability for unsubscribed amount: Committee of subscribers: Duty and liability: Contracts: Rescission: Fraud: Equity: "Clean hands:" Contribution between subscribers.*

1. Where the vendee in a land contract procures from other persons subscriptions of sums to be used in completing the purchase and such subscriptions are by their terms binding at once without regard to the total amount subscribed, he is bound, as between himself and the subscribers, to carry the unsubscribed portion of the liability on the contract.

2. A member of a committee appointed by subscribers to a joint enterprise to act for them in respect to business connected therewith is bound to exercise good faith and diligence in the matter, but does not guarantee success therein, nor is he required to assume a personal liability for their benefit.

3. Even if such committeeman has agreed to advance money in furtherance of the enterprise, he is not bound to do so when, by a breach of the agreement on the part of the other subscribers to provide sufficient additional funds, the undertaking has become hopeless.

4. Even though such committeeman temporarily waived the breach

and made the advance as agreed, yet if afterwards, when the hopelessness of the enterprise became apparent, and before any subscriber had changed his position for the worse, he demanded his money back and it was returned to him by the principal promoter of the enterprise, who was responsible for the original breach and for the failure of the project, there can be no recovery of damages against him in favor of such promoter.

5. Where the promoter of an enterprise procured subscribers by presenting a list containing purported subscriptions by men who had merely lent their names at the request of said promoter and because indemnified by him against liability, such fraud entitled the *bona fide* subscribers, as against a suit by the promoter, to rescind their subscriptions.

6. As between the promoter and one of such decoy subscribers, they being *in pari delicto*, neither could in an equitable action take advantage of the fraudulent arrangement; nor could the promoter, by standing on the equities of the innocent subscribers, obtain a recovery for his own benefit against such decoy subscriber for breach of an agreement by which, as part of the transaction, the latter was to advance money in aid of the enterprise.

7. Where a part of the subscribers to a fund to be used in purchasing land complied with the conditions of the subscription by giving their notes, and payment of some of such notes was enforced before the enterprise failed, but the other notes were thereafter returned to their makers, all who so gave their notes form a class and equity requires that they should contribute *pro rata* to the losses of those who were required to pay. But those who failed to give their notes and those who committed fraud upon their fellow subscribers are not within such class. BARNES, J., dissents in part.

8. No disbursements for traveling or other expenses should in this case be allowed to any of the subscribers or other persons interested in an unsuccessful project for the purchase of land.

APPEALS from a judgment of the circuit court for Portage county: F. C. ESCHWEILER, Judge. *Reversed on appeal of Edmonds and Grell; affirmed on appeal of Lorenze.*

J. J. *Cunningham,* attorney, and *Daniel H. Grady,* of counsel for *Edmonds,* for the defendants *Edmonds* and *Grell.*

D. D. *Conway* and *W. E. Fisher,* for the defendant *Lorenze.*

The following opinion was filed June 17, 1914:

TIMLIN, J.    The plaintiff brought this suit for dissolution
and winding up of the affairs of an alleged copartnership
between himself and thirty-one defendants.    Eighteen of
these defendants appeared in the action in person or by at-
torney.    Others defaulted or were not served with process.
No copartnership was proven.    No objection was made on
the ground of lack of equity jurisdiction and the case is be-
fore us on its merits.    *Edmonds* and *Grell* appeal from a
judgment in favor of their codefendant *Lorenze* and against
them for upwards of $6,000, and *Lorenze* appeals from the
same judgment, claiming only that sufficient damages were
not allowed to him.    All other parties acquiesce in the judg-
ment of the court below by not appealing and not joining in
either appeal.    By the judgment all of the notes were or-
dered to be returned to the subscribers.    One J. A. Ryan had
paid cash and he was awarded a judgment against *Lorenze*
for $1,216.39; Lamb was awarded a like judgment for
$3,642; Halverson for $80; and it was further decreed that
Ryan and Lamb have each a lien to the amount of his allow-
ance against *Lorenze* upon the judgment in favor of *Lorenze*
and against *Edmonds* and *Grell*.    The two appeals may be
considered together.

The facts found by the circuit court together with the un-
disputed facts which are not all covered by the findings may
be set forth as follows: On May 1, 1909, J. P. Malick and
*Abraham Lorenze* secured from Messrs. J. O. Terrell and
Edward Roos of Texas a contract for the sale by the latter
to the former of about 72,000 acres of land in Brewster
county, Texas, part at $1 and part at $1.20 per acre, paid
down $4,000, and agreed to pay $16,000 additional upon the
execution and delivery of a bond for title from the vendors,
and this bond for title was to be executed upon the acceptance
of the title by the vendees after an abstract of title was fur-

nished by vendors and thirty days allowed in which to examine the same. They also assumed and agreed to pay, in the event of their acceptance of the title, liens to the amount of $28,000 resting upon the land, and the balance, or about $36,000, by two notes which they agreed to have negotiated and cashed at face value, but if such notes were not cashed, then to be paid with interest at seven per cent. and to be secured by a trust deed, not specifying what property the trust deed should cover. When the $16,000 and the $28,000 were paid, or at any time after fifty per cent. of the purchase price was paid, the vendees were to receive a deed, while the vendors were to retain a vendor's lien for unpaid remainder. The $4,000 first paid was to be forfeited to the vendors in case of default by the vendees. Malick advanced this first $4,000 payment for himself and *Lorenze.* Malick and *Lorenze* did not have the means to carry out this contract or make the payments due thereon, and immediately upon their return to Wisconsin with their duplicate original had drawn up and circulated a subscription agreement which the plaintiff calls a partnership agreement, and this continued open to subscription until about November 18, 1909, when thirty-two signatures, including those of Malick and *Lorenze,* for amounts varying from $1,000 to $5,000 and aggregating $53,000, were obtained. Of this amount Malick subscribed $5,000, *Lorenze* $5,000, and *Edmonds* $5,000, and a person named Julius Cohn of Kansas City, Missouri, who is named as a defendant in this action, subscribed $5,000. All other subscriptions were for lesser amounts. Malick turned over what is termed the "financing" of this matter to *Lorenze,* the latter employed one Margraf and personally and through Margraf procured all the subscriptions mentioned. Some of these were procured by fraudulent representations and concealments, some like *Edmonds* and McKenny mere decoys, that is to say, they subscribed under a private agreement with *Lorenze* which was intended to guarantee them against lia-

bility on the subscription, and some subscribed with knowl-
edge that *Lorenze* was making a profit.   Malick was appar-
ently held out by *Lorenze* as a person interested in this
contract as vendee, subscriber, and trustee, and all subscrib-
ers signed, of course, with reference to the subscription paper
as written.   Malick died prior to judgment, leaving little or
no estate.   This subscription agreement declared that the
signers subscribed for and agreed to pay Malick, trustee, the
sums set opposite their respective names for the purchase of
the lands in question.   The subscriptions were to be paid,
twenty-five per cent. cash, balance in notes running three, six,
and nine months, respectively, with interest at six per cent.
These notes were to be payable to Malick as trustee and the
purchase price of the land was to be $1.50 per acre, with five
cents per acre additional for expense of consummating the
purchase.   The writing also contained this statement:

"It is distinctly understood that the subscribers do not
incur any other liability than the amount set opposite our
names and that we assume no other obligation than this."

It is also provided that as soon as a sufficient amount was
subscribed to insure the first payment of $25,000, then a
company should be organized and incorporated to take over
the lands above mentioned at the purchase price of not less
than $2 per acre.   There was in fact no first payment of
$25,000 to be made.   This remarkable document states the
quantity of land to be about 72,000 acres and the price to be
$1.50 per acre, which would make the cost $108,000, or
$111,600 with the five cents per acre for expenses.   The total
subscriptions procured were only $53,000 at most, according
to the subscription agreement only one quarter of these, or
$13,250, was payable in cash, and the liability of each signer
was limited to the amount subscribed by him.   The land
was to be turned over to a corporation at $2 per acre after a
sufficient amount was subscribed to insure the payment of
$25,000, and there is no provision that the subscribers should

have any interest in the lands or any shares in the corporation or with reference to their proportionate interest in either. Nor is it stated how much is expected to be procured in subscriptions before the subscriptions become binding. The true interpretation of such a subscription agreement is that the vendee in the land contract who procures the subscriptions will carry the unsubscribed portion of the liability thereon. Where each subscriber is bound as he comes in, whether more subscriptions are obtained or not, this must be the case. *Mr. Lorenze,* having at this stage sole charge of the matter, immediately disabled himself from getting the cash therein subscribed by taking a note from each subscriber for the whole amount of his subscription, due for the most part later than December 6, 1909, and by failing to pay over or collect the $2,500 cash due from himself and Malick according to the subscription agreement. He did not give his own note or cash for his $5,000 subscription, except as hereafter stated, nor did he take any note or cash from Malick for the $5,000 subscription of the latter, nor any note or cash from Julius Cohn for his $5,000 subscription. He did, however, take notes, or cause notes to be taken, from the other subscribers to the amount of $27,900 upon the $53,000 subscriptions. Why he did not get notes from the others is not shown. *Lorenze* did take a note from *Edmonds* for the amount of the subscription of the latter, but made an agreement in writing, the substance of which was to protect *Edmonds* from liability on this note. On August 23d Malick assigned all his interest in this contract to his associate vendee, *Lorenze,* but Malick continued to act as trustee and to appear interested in the contract. The situation at this time was such that there was no prospect of getting any money from the subscribers to make the $16,000 payment due upon the land contract to Terrell and Roos, much less the remaining payments. *Lorenze* sent Mr. Burke, his attorney, to Texas and obtained an extension of time for the payment of the $16,000 due upon

the land contract until December 6, 1909, the vendors making it clearly known that no further extension would be granted.

On or about November 10th *Lorenze* sent out notices to the subscribers in the name of Malick calling a meeting of said subscribers at the office of the "syndicate" in the Majestic Building in Milwaukee for November 18, 1909. He also sent out proxies with these notices, to be signed by each subscriber who could not attend, appointing *Lorenze* attorney in fact for such subscriber at said meeting with broad powers. The meeting was accordingly held. A small number of the subscribers attended. The defendant *Grell* was present but *Edmonds* was not, he having signed one of the proxies to *Lorenze*. It was apparent to all that neither the vendees nor the subscribers, nor both together, had funds or resources with which to meet the payment of $16,000, much less the $25,000 specified in the subscription agreement. No one seemed to have any very clear idea of how much money was on hand or how much was required or whether the payment to be made was $25,000 or $20,000 or $16,000. Proposed articles of incorporation of a Texas corporation authorized to go into the business of cattle ranching and hold and deal in land necessary for that purpose were submitted by Burke and approved. These were not executed by any person except *Lorenze,* and the names of the other incorporators were blank. In attempted conformity with the laws of Texas, however, a paragraph in these proposed articles of incorporation stated the names of the directors for the first year and named *Edmonds, Lorenze, Grell,* and Lamb as Wisconsin members, and it was testified to without contradiction that the name of the necessary Texas member or members should be inserted after the committee hereinafter mentioned reached Texas. The meeting was organized by the election of a chairman and secretary, and the secretary kept what he called minutes of the meeting, which state that "it was moved by *Mr. Grell*

and carried : to provide sufficient funds to take up the contract before it expires, two notes of $5,000 each shall be made out and arrangements made for *Mr. Lorenze* and *Mr. Edmonds* to each raise the money on one of these notes after they shall be indorsed by the other members of the committee on organization who have agreed to do so." It otherwise appears that a committee consisting of the persons last named was selected *to go to Texas and take up the contract and organize the corporation.* "On motion the meeting adjourned, subject to call of the secretary and treasurer, with the understanding that nothing now stands in the way of acquiring the land and carrying on the business of the company (cattle raising). As arrangements have been completed for money to take up the contract, the remainder of the financing was considered by those present a simple matter."

It must be observed here that these minutes are not true. Arrangements had not been completed. *Mr. Edmonds* was not present and had not given his assent to act as director or as committeeman or to go to Texas or to advance money or to borrow money for this purpose. The expected money lender had not yet given his consent to loan any money, and the financing of the enterprise in its then desperate condition could not be considered a simple matter except by a very simple person. From the fact that they arranged to borrow $10,000 we may infer that they thought they had either $6,000 or $10,000 or $15,000 on hand. In fact they had nothing but the notes of some of the subscribers. Oral testimony is given to the effect that it was not at this meeting decided whether the land should be conveyed to a corporation or to three trustees. This was to be decided after the committee got to Texas. But no one could be made trustee without his consent, no one had yet consented, the trustee would have to assume heavy obligations, a fact they did not seem to know, and it was extremely doubtful whether the corporation, even by calling itself a cattle company, could hold lands in

Texas.   In answer to the question, "What was stated there as
to the duties of the committee, if any?" Mr. Burke, the at-
torney for *Lorenze,* who was present and observant, an-
swered:

"Well, the transaction had to be closed on the 6th of De-
cember.   They were going down at some future time.   At
that meeting there was no designated time that they were to
go, but it was understood and stated at the meeting that more
money would have to be raised.   There was not sufficient at
that first meeting, and the idea was principally at that meet-
ing to get in more money, and this committee was when they
were done, was to go down and close up the transaction. . . .
*Mr. Grell* stated as long as there was necessity for quick ac-
tion and as long as some of these subscriptions were not com-
ing in there should be two notes executed . . . I think the
notes were signed that night. . . . And these notes were to
be used at a subsequent meeting . . ."

These are the two notes of $5,000 each, one of which was
expected to be indorsed and discounted by *Mr. Lorenze* and
one by *Mr. Edmonds.*   Manifestly there was up to this point
no contract made between the subscribers and the persons who
were to go to Texas upon which any liability of the latter
could be predicated.   The next meeting was held Novem-
ber 29, 1909.   The purpose of this meeting was to see what
finances had been gotten together.   *Mr. Edmonds* was pres-
ent at this meeting and he was told that he had been selected
for president, refused to accept it, told of the necessity of
borrowing money and what was expected of him with refer-
ence to the $5,000, *and that he was expected to go to Texas
as a member of this committee and make this payment* on the
land contract.   He accepted the agency, but, instead of dis-
counting the $5,000 note and raising money on it, took $5,000
of his own funds and went to Texas with the other members
of the committee.   The substance, therefore, of the agree-
ment arising from this transaction between the subscribers
present at the meeting through those who communicated it to

*Mr. Edmonds* and *Mr. Edmonds* was that he should loan money or credit to the amount of $5,000 to the subscribers and that he should exercise good faith and due diligence in the matter of his agency, and his agreement went no further than this. *Noble v. Libby,* 144 Wis. 632, 129 N. W. 791, and cases cited in opinion. He did not guarantee success nor agree to assume any liability under the contract nor to put in his advance or loan or money regardless of how desperate the affair appeared. *Mr. Grell* also went to Texas as a member of the committee under the same obligation except as to loaning money or credit, and *Grell* took with him $1,000 of his own money and $1,000 intrusted to him by Dr. Engsberg, another subscriber. The following evidence is uncontroverted: "I had $1,000 from my friend Dr. Engsberg and I was to use my own judgment there to pay it or not. . . . Dr. Engsberg was not at the November meeting. I might have had his proxy. I think there were good reasons for taking the money back." *Lorenze* also went down to Texas as a member of the committee under at least the same obligation to the subscribers, but also under a direct obligation to the vendors. He did not discount the $5,000 note intrusted to him nor, except his $5,000, bring down any considerable sum of money. Lamb, a Rock county farmer who was shorn to the extent of $3,000, was present at both November meetings and says the amount to be raised was at the first meeting $25,000, at the second it had come down to $20,000. According to this, it must have been assumed that there was money on hand besides the $10,000 to be borrowed. *Lorenze* makes various ingenious excuses to account for this which are immaterial. If *Edmonds* impliedly or expressly agreed to have $5,000 ready to pay over to the vendors and *Grell* $2,000, *Lorenze* by at least the same obligation agreed to have the remainder ready for the same purpose. Suffice it here to say that he breached his contract by failing so to do. Instead of doing so, he busied himself in the interim in

trying to sell or discount some of the notes taken from the subscribers. Two of these notes he disposed of to Shoemaker for $1,980, receiving Shoemaker's checks therefor under an agreement that he would not use these checks for some time. The note of the subscriber Mr. Lamb for $3,000 he discounted to Mr. Cunningham, receiving $2,940. He borrowed $2,500 from one Hackett on personal collateral of his own.

It is very difficult from his testimony to tell how much money he had with him in Texas. He, or Malick for him, must have had still more than $20,000 in notes of subscribers on hand, but did not or could not use them. The evidence tends to show that he had with him about $9,000, the proceeds of notes sold or cashed by him and including money of his own in the form of checks and drafts. The vendors declined to receive private checks. A telegram to Wisconsin elicited the information that Shoemaker had stopped payment on his checks for $1,980. This diminished the funds that *Lorenze* had by about $2,000. It left the whole, counting *Edmonds's* $5,000, *Grell's* $2,000, and the remaining available funds of all kinds in *Lorenze's* hands, $2,000 short of the requisite $16,000 for making the payment then due. They found an agent to whom the vendors owed $2,000 commission, and this agent agreed to take *Lorenze* instead of the vendors as his debtor for this amount, the vendors agreed to accept this $2,000 waiver as part of the $16,000 payment, and the drafts carried by *Grell* and *Edmonds* were turned over to *Lorenze* to be by him handed to the vendors as and for the first payment. These with what money and checks *Lorenze* had left amounted to only $14,000. *Mr. Grell* at this stage demanded back his $2,000. This was immediately followed by a demand on the part of *Edmonds* for his $5,000. Much acrimonious discussion followed, and the vendors returned to *Lorenze* and *Lorenze* returned to *Grell* and *Edmonds* their drafts. The contract was at an end and the $4,000 initial payment was declared forfeited.

There is much conflict in the evidence with reference to whether *Grell* and *Edmonds* demanded the return of their drafts because *Lorenze* had refused to divide with them a commission or profit of twenty-odd thousand dollars which he was making on the deal, being the difference between the amount agreed to be paid by him to the vendors and $1.50 per acre, the amount at which the land was put in to the subscribers. There is no express finding upon this point and none is necessary. Assuming they made this claim, they had other ample grounds for backing out. The failure of the subscribers and *Lorenze* to raise $9,000 of the $16,000 to be paid, the fact that $28,000 more might come due within sixty days and no funds provided for its payment, and that there was no person, or persons, of financial ability to raise it, and that $36,200 more obligations were to be assumed or cash raised, that no corporation capable of taking the land was organized, that those who might consent to be trustees must assume personal obligations of $64,000, and the utter hopelessness and helplessness of the situation, was then apparent, together with the enormous profits insisted on by *Lorenze* which had not been disclosed to all the subscribers, the necessity of resort to the agent of the vendors to waive his commission for the present, the same to become due later, made it to the advantage of all persons interested except *Lorenze* to withdraw from this venture as soon as possible. The fact that the vendors were satisfied with the waiver of their agent's commission and the assumption of it by the buyers is of little or no weight. The subscribers and *Mr. Edmonds* and *Mr. Grell* had a right to insist that the remainder of the $16,000 be furnished not by ingenious devices but in money. The necessity of resorting to this also further disclosed the utter financial inability of *Lorenze* to carry out the contract or to save his fellow adventurers from total loss of any amount which they might pay in. Take the case of *Mr. Grell* with $1,000 intrusted to him by his friend Dr. Engsberg to use his judgment whether to pay it over or

not. *Grell* would have been derelict in his duty to Dr. Engsberg if he did not demand back money so intrusted to him. He should never have turned this money over to *Lorenze.* To turn this money over under the circumstances then apparent would be to throw it away, because there were no means in hand or in prospect with which to make the other payments. Without this $1,000 belonging to Dr. Engsberg and after the waiver of commission by the seller's agent there was not money enough available to make the payment of $16,000. *Lorenze* had brought the enterprise into this condition by not obtaining sufficient subscriptions, by taking long-time notes from the subscribers for the full amount of their subscriptions, by failing to procure any notes or cash from Malick, Cohn, and others, by failing to give his note or cash upon his own subscription, and by his fraudulent practices in obtaining subscriptions which could not be enforced.

The learned circuit court held that *Edmonds* and *Grell,* by demanding back their drafts and refusing to proceed with the purchase, breached a contractual duty due to all the subscribers, including *Lorenze,* assumed or agreed to by them when they undertook to serve on the committee which was to go to Texas and close up the land purchase. This may be looked at from the standpoint of law or equity. At law the duty of an agent, employee, or committeeman is to exercise good faith and diligence and exert himself in his employment for the benefit of his principal or master, but he makes no agreement to achieve absolute results. He is not required in order to achieve a result to incur heavy personal obligations for the benefit of an irresponsible principal. *Noble v. Libby,* 144 Wis. 632, 129 N. W. 791. He may like other parties to a contract withdraw from a contract because of a serious breach by the other party thereto. *Lorenze,* representing himself and the other subscribers, committed a serious breach in failing to have present and ready for payment on the contract such sum that, with the contribution of *Grell* and *Edmonds,*

the first payment would have been covered. There was perhaps a temporary waiver of this breach when *Grell* and *Edmonds* handed in their drafts to *Lorenze,* but before any of the subscribers had changed his position for the worse on this account they demanded and received them back. They had good cause for doing so and there was therefore no liability. But we are in a court of equity, and in that court there are additional rules which go to prevent any recovery against them for the benefit of *Lorenze.* The latter occupied a fiduciary relation to all the subscribers. He not only committed a breach of agreement in failing to have with him at the place of payment money sufficient, with that produced by *Grell* and *Edmonds,* to make the first payment, but he was guilty of fraud in the particulars above mentioned. In addition to what has been already stated, it was a fraud upon all the subscribers to present to them for signature a list containing a purported subscription by men who were not *bona fide* subscribers, but who lent their names thereto at the request of and because indemnified against liability thereon by *Lorenze. Downie v. White,* 12 Wis. 176; *Davidson's Case,* 3 De Gex & S. 21; 1 Cook, Corp. (7th ed.) p. 420 and cases. There were at least two of such subscriptions, viz. *Edmonds* and *McKenny,* and the alleged subscriptions of Malick and Cohn were probably in the same category. It was not explained why the latter did not pay in or give notes, and after what was shown it was incumbent upon the fiduciary, *Lorenze,* to explain. *Edmonds* of course could take no advantage by affirmative action of the fraudulent arrangement he made with *Lorenze* relative to the subscription, by which he allowed his name to be used as a decoy for other subscribers, and this doubtless would have prevented *Edmonds* coming into equity to recover his $5,000 and rescind the whole transaction. But as against a suit by *Lorenze,* other subscribers could rescind on this ground unless they knew it when they signed. If *Edmonds* could not obtain relief in equity the

transaction would have the same effect as to *Mr. Lorenze.*
They were as to this *in pari delicto.* The recovery here is
solely for the benefit of *Mr. Lorenze.* He cannot stand upon
the equities of the innocent subscribers. It is also highly
probable that, instead of causing loss to the last named sub-
scribers, *Grell* and *Edmonds* rather did them good service by
withdrawing. They saved the amount subscribed to all those
who had not yet paid their subscription. We need not specu-
late on what would happen if the vendors refused to sur-
render the drafts of *Grell* and *Edmonds* or if *Lorenze* re-
fused to surrender them. He did surrender them and he is
in a court of equity, and equity will leave him just where he
put himself. As to him this surrender must stand.

This view of the case disposes of the appeals by reversal
upon the *Grell* and *Edmonds* appeal and by *Lorenze* taking
nothing on his appeal. We cannot admit his right of recov-
ery for damages or for disbursements. But there is another
aspect of the case. *Lorenze,* acting for the subscribers who
had given notes and for himself, sold the notes of two of the
subscribers, J. A. Ryan and J. R. Lamb, which were given
for their subscriptions, and received the avails of such sales,
and the makers were obliged to pay the notes. It was pro-
vided in the judgment appealed from that J. A. Ryan on this
account have judgment against *Lorenze* for $1,216.39, and
Lamb a judgment against the same appellant for $3,642. It
was further decreed that said Ryan and Lamb each had and
each was given a lien upon the judgment which *Lorenze* re-
covered against *Grell* and *Edmonds* to the amount of their
respective judgments against *Lorenze* aforesaid. This judg-
ment of *Lorenze* against *Edmonds* and *Grell* we are con-
strained to reverse, and that leaves Ryan and Lamb unpro-
vided for to the extent that they were protected by the decree
below. The two latter apparently signed the subscription
list after *Edmonds* did and *Edmonds* was apparently going
in upon the same level as his fellow subscribers, but in fact

his subscription and his note given pursuant thereto were by agreement between him and Lamb, in substance and effect, but the liability of *Lorenze,* who had indemnified *Edmonds* against all liability thereon. The liability of *Edmonds* is not concluded hereby, but is open to investigation and determination. By the decree of the court below as now modified by this court, each of the co-adventurers gets back his note on the theory that the adventure failed and was at an end, but Ryan and Lamb receive for their money only a judgment against *Lorenze.* This does not seem equitable. So far as the subscribers guilty of no fraud and who complied with the conditions of subscription by giving notes are concerned, they form a class because their relations to the enterprise are identical. Among the members of that class the maxim "Equality is equity" obtains. 1 Pom. Eq. Jur. (3d ed.) §§ 405, 411. In the same attempt to benefit all in the ratio of their subscriptions these notes were given. The failure of the project found some who had been compelled to pay the notes so given for their subscriptions, while for the most part the like notes of their fellow subscribers were in the hands of the payee named therein and by the decree properly ordered surrendered to the makers. Equity requires that among such persons there be a *pro rata* contribution to such losses. But those who failed to carry out the conditions of their subscriptions by giving notes and those who committed fraud upon their fellow subscribers are manifestly not within this class. Indeed it is very doubtful whether subscribers who gave no note prior to the failure of the project and who were not bound as vendees in the land contract become bounden as parties. *Lathrop v. Knapp,* 27 Wis. 214; *S. C.* 37 Wis. 307; 37 Cyc. 484. But all who closed their subscription by the required note and who have been served with process or who have appeared therein should contribute in proportion to their respective subscriptions to make good the losses of Ryan and Lamb and any other subscriber who may have paid cash

upon his subscription. Such persons should be allowed to file a cross-bill and complaint against the plaintiff and the other described defendants and against *Edmonds* to recover, if they can, from each such proportion of their loss as the amount subscribed by the plaintiff or any other defendant bears to the whole amount of subscription of plaintiff and all defendants who had been served with process or who have appeared herein. In other words, Ryan and Lamb, the plaintiff, and such defendants belong in the same class and must each contribute in proportion to make good the loss of Ryan and Lamb and any other person who paid in cash on his subscription. But no disbursements for traveling expenses or other expenses should be allowed to any of such subscribers or to any person. A subscription agreement like this is something like a composition agreement. Equality among the subscribers is implied by the law from the very nature of the transaction. *Lee v. Sellers,* 81 Pa. St. 473; *Henry v. Murphy,* 54 Ala. 246; *Hefter v. Cahn,* 73 Ill. 296; *Musgat v. Wybro,* 33 Wis. 515.

It is considered, therefore, that the judgment be reversed upon the appeal of *Edmonds* and *Grell,* that *Lorenze* take nothing by his appeal, and that the defendants J. A. Ryan and J. R. Lamb and any other defendant who has paid cash upon his subscription be permitted to file a cross-complaint against the plaintiff and all their codefendants who have been served with process or who have appeared in this action for the purpose of recovering from each such proportion of the loss sustained by such cash-paying subscribers as the subscription of that subscriber bears to the whole amount of subscriptions by persons who have been served with process or appeared in this action, and also to make such claim against their codefendant *Edmonds* on account of fraud as they may be advised. But one satisfaction to be allowed.

*By the Court.*—It is so ordered. One bill of costs by *Edmonds* against *Lorenze* only.

BARNES, J. (*concurring*). I agree to what has been decided, with this qualification: By the subscription paper which was signed the subscribers agreed to pay a certain percentage of their subscription in cash and to give their notes for the balance. I think that by signing the subscription paper all of the subscribers became equally bound as between themselves to make contribution, if a right of contribution exists, and that if the proceeding suggested in the opinion is resorted to all of the subscribers should be brought in in the cross-complaint and all should be compelled to contribute their *pro rata* share of the amount necessary to place Ryan and Lamb on a basis of equality with the other subscribers. I do not think that the subscribers who breached their agreement by failing to give their notes should be relieved of liability because of their breach. Of course if the judgment against *Lorenze* is collectible, no such proceeding as is indicated is necessary.

VINJE, J., dissents.

SIEBECKER, J., dissents in part.

The appellant *Grell* moved for a rehearing. On October 7, 1914, the mandate was amended so as to award costs in favor of *Edmonds* and *Grell* against the defendant *Lorenze*.