[Civ. No. 7416. First Appellate District, Division One.—June 27, 1931.]

SAN FRANCISCO IRON AND METAL COMPANY (a Corporation), Respondent, v. AMERICAN MILLING & INDUSTRIAL COMPANY (a Corporation) et al., Appellants.

J. G. De Forest and Manson & Allan for Appellants.

Brownstone & Goodman and Goldman & Altman for Respondent.

KNIGHT, J.—The controversy involved in this appeal arises out of the alleged breach of a joint adventure agreement relating to the purchase and sale of personal property. The complaint contains three causes of action, separately stated. The first is for the reasonable value of services ren-

dered, the amount claimed being $4,000; the second is to recover $8,000 which plaintiff claims to have expended for the use and benefit of the defendants; and the third is for damages in the sum of $250,000, it being alleged in this regard that after plaintiff and defendants entered into said agreement defendants violated the same by secretly acquiring the property and reselling the same on their own account. The first cause of action was subsequently dismissed, and the amount sued for in the second was reduced to $4,802.92. The trial took place before a jury which returned a verdict in plaintiff's favor for the sum of $20,000. Judgment was entered accordingly and defendants have appealed. Insufficiency of the evidence to support the judgment, errors of law committed during the course of the trial in ruling upon the admissibility of evidence, and the giving, refusal to give, and modification of certain instructions to the jury constitute the main grounds of appeal.

The subject matter of the enterprise consisted of 4,000 unassembled railroad cars which for several years had been lying at Coquitlam and Vancouver, British Columbia. They were manufactured during the war for the use of the Russian government under the Kerensky *régime*, and while en route across Canada the powers of that *régime* were overthrown, and thereupon the cars were seized by the British government and subsequently passed into the hands of private ownership, and were offered for sale. Plaintiff's business was that of buying and selling new and second-hand iron and metal commodities of various kinds including old railroad equipment. Its principal owners were Harry Silberman and his son, Lou Silberman, and its place of business was in San Francisco. The defendant company was owned by the Kagan family and was engaged in the general mercantile business in China. A. I. Kagan, its principal owner, resided in Harbin, Manchuria, and his son, Jacob Kagan, was its American representative. Previously the two companies transacted some business together, and on August 27, 1925, while A. I. Kagan was visiting in San Francisco, the Silbermans called a conference at plaintiff's office, at which they brought to the attention of the Kagans the existence and location of said cars, the history of their manufacture and seizure, etc., and unfolded a proposition to purchase and sell the same on joint account as scrap iron, in this country,

which they said could be done at a good profit. There is a dispute as to whether the Kagans had any previous knowledge of the existence of said cars, Lou Silberman having testified that the Kagans knew nothing of them, and Jacob Kagan having testified that he was aware of their existence. However that may be, the Kagans agreed to enter into the enterprise, claiming, however, that much larger profits could be realized by allowing them to sell the cars, assembled, to the present Russian government, which they asserted they would be able to do. Little, if anything, was known at that time about the material, either as to its quantity, quality, condition or price; and consequently an agreement could not be drawn embodying all of the details of the execution of the proposed enterprise; but after much discussion a document was prepared, which was revised by the Kagans, and then signed by the respective parties. It read as follows:

"Preliminary Purchase and Sales Agreement Covering 4000 Cars, Between A. I. Kagan and the San Francisco Iron & Metal Company.

"August 27, 1925.

"Mr. A. I. Kagan,

"Berkeley, California.

"Dear Sir:—With reference to the 4000 cars now stored in Canada which we are contemplating on purchasing in joint account with you. It is to be understood that in the event this purchase is consummated that it will be on a 50–50 per cent basis of the purchase price and the selling price between us, each one putting up an equal amount of money or credit to pay for same, on basis of purchase price, also all expenses incurred such as freight, insurance, etc., to be stood equally between us. Also the buying and selling price covering this material and all other conditions to be mutually agreed upon and accepted by both parties hereto mentioned. Final detail, agreement to be made at the time of purchasing of material.

"Very truly yours,

"SAN FRANCISCO IRON & METAL Co.

"By L. H. SILBERMAN, Vice-President.

"Accepted—A. KAGAN."

Shortly afterward, A. I. Kagan returned to China, and in conformity with the plan previously agreed upon Lou Silberman, who transacted all of the subsequent business on be-

half of his firm, proceeded at once to execute the plans for the acquisition of the property. He first inspected the material in British Columbia, and found it in good condition. Upon his return to San Francisco he so reported to Jacob Kagan, and was urged by the latter to prosecute with all diligence the negotiations for its purchase, which Silberman proceeded to do. His efforts met with many obstacles, however, and extended over some sixteen months. During that period he made four trips to New York to confer with the owner's representatives. The first trip was made in September, 1925, the second in June, 1926, the third in September, 1926, and the fourth in December, 1926; and during the intervals between trips he carried on negotiations through correspondence. At first he was told that the cars were "out on option" and not subject to purchase. Later the owners indicated a willingness to sell, but insisted on imposing burdensome restrictions upon the resale thereof, which would have prevented the execution of the enterprise as planned by the parties; and later he was told again that the cars were "out on option" and could not be purchased until the option expired. During the progress of these negotiations he reported the results to Jacob Kagan and was at all times urged by the latter to continue his efforts to acquire the property. On his third trip to New York, which occurred in September, 1926, he was informed that an option was then outstanding on the cars; and consequently, to avoid the expense and delay of remaining in New York, he turned over the negotiations to a New York broker named Dulien, with instructions to close the purchase of the cars if possible at the expiration of said option. On December 15, 1926, Dulien phoned Silberman from New York that the opportune time had come to make the purchase; that the dealers were anxious to sell and that the cars could be obtained for $14 or $15 a ton. Thereupon Silberman cabled A. I. Kagan as follows: "Have indication can purchase Vancouver cars. Are you interested in. Please reply at once." On December 17th Kagan replied as follows: "Your silence eighteen months consider you are not interested in cars. Telegraph fully your views at what price you can buy F. O. B. Vancouver delivery within six months and all other conditions. Can you secure letter credit ninety per cent? Await your reply." Within the next few days Dulien phoned Silberman

from New York again urging him to act at once if he were to consummate the purchase, and on December 21st at Dulien's request Silberman telegraphed Dulien $5,000 with which to make the initial payment on an option. On December 24th Dulien again phoned Silberman as to the necessity of consummating the purchase at once, whereupon Silberman again cabled A. I. Kagan as follows: "Vancouver cars can buy fourteen dollars per ton two thousand pounds. Telegraph immediately if you are interested in and will put up letter credit fifty per cent as per agreement." No reply was received to this cablegram. On December 27th Silberman received a letter from Dulien inclosing the option he had obtained. It was dated December 21, 1926, acknowledged receipt of the down payment of $5,000, and provided for an additional payment of $30,000 on or before December 28, 1926, "or a full, clean, irrevocable letter of credit for entire amount of approximately $400,000 buyer's option". The price fixed for the property was $12.75 a ton. Upon the receipt of this letter, which was the first knowledge Silberman had of the terms of the option, he went to New York at once; but having received no reply from the Kagans the second payment of $30,000, due on December 28, 1926, was not made, and consequently the option lapsed; and upon his arrival in New York he learned that the Kagans had been secretly negotiating for the purchase of the cars on their own account and had made an initial payment thereon, but did not learn of the terms of the Kagan purchase until the following June.

The circumstances under which these secret negotiations were carried on and consummated were revealed by a series of cablegrams, in code, passing between Kagan and his son, which plaintiff caused to be produced at the trial. The first was sent by Kagan to his son on November 1, 1926, and was as follows: "Proceed E. D. Locke to New York Open negotiations with Rikhoond [Richmond] Scrap Steel Company 10 Woolworth Building. In strict confidence May we buy entire quantity material for cars Vancouver 36,000 tons of 2240 lbs. including parts inside warehouse $14.50 per ton of 2240 lbs. alongside vessel Will deposit 10% against Bank guarantee in fulfilment of contract Balance payable about 4 to about 5 months against shipping documents. Storage and interest from January 1st. for our account. Do your

utmost. If you are unable to what can be done option on now Telegraph present position Matter Message ends Commission 1½% for both together.'' Subsequently, however, as will be remembered, Kagan, Sr., received a message from Silberman with reference to the purchase of the cars, to which he replied, on December 17, 1926, and the inquiries he made therein indicated that he was still collaborating with them under ·the joint venture agreement; whereupon and on December 20, 1926, he cabled his son as follows: ''Have a telegram from Silberman (San Francisco Iron & Metal Co.) whether we interested in cars what is your relation with him do they wish buy for joint account or commission what is the price what is your opinion regarding it joint account telegraph immediately.'' The reply message from his son was as follows: ''Ref. to your telegram of 20th inst. We have not been in negotiations with Silberman (San Francisco Iron & Metal Co.) Strongly recommend that you do not joint account unless absolutely necessary. Buy for our account. Can you make firm offer. Why do you not write. No letters from you.'' Upon the receipt of this reply Kagan, Sr., proceeded to close the purchase of the property on his own account, and on December 22, 1926, cabled his son as follows: ''Ref. to your telegram of 20th inst. Following is strictly confidential and must not be communicated to anyone. Negotiated through us owners agent at port of loading. Hope to secure (it). Very probably you will have to go in a few days to Vancouver Have written 5th December . . . '' And on December 27, 1926, he again cabled his son that he had closed the transaction with the owners and gave instructions to his son as to handling the property. The total amount paid for the property was $395,000, the price per ton being $12.50. An initial payment of $10,000 was made thereon on December 31, 1926, which was three days after the Dulien option had expired; a second payment of $27,500 was made on January 8, 1927, on which date a formal sales contract was executed; $56,250 was paid on or before January 15, 1927, and it was agreed that the balance of $281,250 should be paid in June, 1927.

◼ Defendant's principal contention is that the question of the existence of the joint adventure agreement is necessarily one of law which must be determined from the terms of the document signed by the parties on August 27, 1925, to the

exclusion of all other matters leading up to and following the preparation and signing thereof, and all oral understandings had between the parties as to the plan of executing the joint adventure; and that the terms of said document are legally insufficient to create a joint adventure agreement, and at best constitute merely a contract to enter into a contract in the future, which not only was lacking in mutuality, but otherwise was unenforceable in law and eventually was abandoned by the parties. The rule appears to be well settled, however, that where the existence of the relationship of joint adventurers is in issue, and there is substantial evidence tending to prove that the parties intended to join their efforts in furtherance of the enterprise for their joint profit, the question is pre-eminently one of fact for the determination of the jury (*Hoge* v. *George*, 27 Wyo. 423 [18 A. L. R. 469, 200 Pac. 96]; *Van Tine* v. *Hilands*, 131 Fed. 124; *Brady* v. *Colhoun*, 1 Penr. & W. [Pa.] 140); and in our opinion the evidence in the present case is legally sufficient under the authorities hereinafter cited to sustain the implied finding of the jury that a joint adventure agreement was entered into between the parties as alleged in the complaint and that the same was subsequently violated by the defendants.

As said in *Goss* v. *Lanin*, 170 Iowa, 57 [152 N. W. 43, 46], which appears to be one of the leading cases, and is cited by both parties: "It is not necessary that there should be a specific formal agreement to enter into a joint enterprise, or that the interests of the parties should be definitely settled in such agreement, or that there should be a formal agreement as to the sharing in the profits. If there be a joint enterprise proven, even by direct evidence of a mutual agreement to that end, or by proof of facts and circumstances from which it is made to appear that such enterprise was, in fact, entered into, the law fixes their rights. (Citing cases.)" In other words, to appropriate the language of the court in *Anderson* v. *Blair*, 202 Ala. 209 [80 South. 31, 35]: " . . . The great majority of contracts of joint adventure and of partnership . . . do not point out precisely what each party is to do under them. Such a provision is quite unusual, and, we should say, quite impossible in many cases." Such is the law in this state, and it has been expressly so restated in the recent case of *Andrews* v.

*Bush,* 109 Cal. App. 511 [293 Pac. 152, 154], wherein the court said: "Such an agreement is not invalid because of indefiniteness in respect to its details. (33 C. J. 848.) Thus a partnership, which in many respects is similar to a joint adventure (*Menefee* v. *Oxnam,* 42 Cal. App. 81, 85 [183 Pac. 379]), is none the less a partnership though there be no definite agreement as to how the profits shall be divided. (*Doudell* v. *Shoo,* 20 Cal. App. 424, 438 [129 Pac. 478].) Likewise, with a joint adventure. (*Hoge* v. *George,* 27 Wyo. 423 [18 A. L. R. 469, 200 Pac. 96, 99] ; *Goss* v. *Lanin,* 170 Iowa, 57 [152 N. W. 43, 46].) In considering whether or not a relationship such as that of joint adventurers or partners has been created the courts are guided not only by the spoken or written words of the contracting parties, but also by their acts." (Citing numerous authorities, including *Niroad* v. *Farnell,* 11 Cal. App. 767 [106 Pac. 252], and *Saunders* v. *McDonough,* 191 Ala. 119 [67 South. 591, 596], hereafter referred to.)

Defendants stress some of the language used in the document in question, such as "*preliminary* purchase and sales agreement"; also "it is to be understood that *in the event* this purchase is consummated that it will be on a 50–50 per cent basis . . ." etc. (italics ours) contending that the italicized words indicate only an intention to create a joint adventure upon future agreement at the option of the parties. But as held in *Miller* v. *Walser,* 42 Nev. 497 [181 Pac. 437], the joint adventure is consummated when the minds of the parties meet upon the point of entering into it and their mutual promises are exchanged; and it is evident that in making the above contention defendants fail to draw the distinction between such act, that is, the meeting of the minds of the parties in their decision to join in the adventure, of which there is ample evidence, and the subsequent act of the parties in attempting to reduce to writing some of the promises upon which the adventure was founded and the conditions upon which it was to continue, the controlling one being the successful efforts of the parties to purchase the cars. And there appears to be nothing peculiar about the language referred to by defendants for it is self-evident that any joint adventure agreement must of necessity relate to acts to be performed in the future; and the entire document when read in the light of and considered in connection

with the testimony of the parties as to what transpired immediately preceding its execution clearly implies what the oral testimony shows, that the parties had already agreed to enter into the enterprise. ■ True, "in the event" the cars the parties "contemplated on purchasing in joint account" could not be purchased, the enterprise would necessarily terminate; but there was no limitation of time stated within which they were to be purchased, and consequently no date was fixed for the termination of the adventure and the authorities are uniform in holding that such, an agreement remains in full force until its purpose is accomplished or it is definitely ascertained that its purpose cannot be accomplished (*Goss* v. *Lanin, supra*); and that while it is in force neither party has the right to withdraw therefrom upon the ground that it is no longer advantageous to him (*Bane* v. *Dow*, 80 Wash. 631 [142 Pac. 23]), or for the purpose of acting independently to the exclusion of his coadventurers. (*Goss* v. *Lanin, supra.*)

■ The existence of the joint adventure being established, it follows that a fiduciary relationship between the coadventurers arose therefrom, which demanded of them the utmost good faith in all their dealings with each other; and this requirement of good faith alone forbade the accrual of any profit, or the acquisition of any secret advantage by one of the coadventurers over the other. (*Goss* v. *Lanin, supra; Miller* v. *Walser, supra; Hardin* v. *Robinson,* 178 App. Div. 724 [162 N. Y. Supp. 531]; *Merritt* v. *Joyce,* 117 Minn. 235 [135 N. W. 820]; *Kent* v. *Costin,* 130 Minn. 450 [153 N. W. 874]; *Selwyn & Co.* v. *Waller,* 212 N. Y. 507 [L. R. A. 1915B, 160, 106 N. E. 321]; *Sicklesteel* v. *Edmonds,* 158 Wis. 122 [147 N. W. 1024]; *Saunders* v. *McDonough, supra; McMullen* v. *Harris,* 165 Iowa, 703 [147 N. W. 164, 165]; *Rich* v. *Teasley,* 194 Fed. 534; *Irvine* v. *Campbell,* 121 Minn. 192 [Ann. Cas. 1914C, 689, 141 N. W. 108].)

■ Defendants further contend that even though the joint adventure was created, plaintiff can recover only upon proving that defendants disposed of the property at a profit; and in this connection they offered evidence to show that they sold the material at a loss; but the evidence was excluded. The rule thus sought to be invoked would doubtless apply if the material had been purchased and disposed

of in pursuance of the joint adventure agreement, and plaintiff were here seeking relief in equity in a suit for an accounting and its share of the alleged profits. But such is not the case. The agreement was breached by the defendants at the very threshold of the enterprise by secretly negotiating for and purchasing the property on their own account, and the settled rule in such cases is, as stated in *Keyes* v. *Nims,* 43 Cal. App. 1 [184 Pac. 695, 699], " . . . that one party in a joint adventure may sue the other at law for a breach of the contract or a share of the profits or losses or a contribution for advances made in excess of his share, as where the adventure has been closed and a party thereto is entitled to a sum certain as his share of the adventure, but the right thus to sue at law does not preclude a suit in equity for an accounting. (15 Ruling Case Law, p. 507.)" (See, also, *McCreery* v. *Green,* 38 Mich. 172; *Saunders* v. *McDonough, supra; Joseph* v. *Sulzberger,* 136 App. Div. 499 [121 N. Y. Supp. 73] ; *Lind* v. *Webber,* 36 Nev. 623 [Ann. Cas. 1916A, 1202, 50 L. R. A. (N. S.) 1046, 134 Pac. 461, 135 Pac. 139, 141 Pac. 458].) Here the plaintiff elected to sue for damages on account of such breach, and having shown that the material in question had a ready and ascertainable market value, was entitled to recover from the defendants upon the basis of the difference between the purchase price thereof and the market value at the time of the breach (*Joseph* v. *Sulzberger, supra*) ; and in view of the terms of the document dated August 27, 1925, plaintiff was entitled to recover also the expenses incurred in promoting the enterprise up to the time it learned of the breach. (*Goss* v. *Lanin, supra.*) The evidence is amply sufficient to support the award make by the jury as to both elements. In fact, it would have been legally sufficient to sustain the verdict for a much larger amount, eliminating entirely the element of expenses.

Nor do we find any error in the rulings of the trial court relating to the testimony of the witness Rocca. The cablegram from Kagan, Sr., to Rocca, dated May 27, 1928, was admissible as a declaration against interest; and it was not objectionable upon the ground that it related to a compromise, as defendants contend, for admittedly there were no communications whatever between the parties themselves to that end. (*Smith* v. *Whittier,* 95 Cal. 279 [80 Pac.

529] ; citing a number of cases from other jurisdictions; *Story* v. *Nidiffer,* 146 Cal. 549 [80 Pac. 692] ; *Ashlock* v. *Linder,* 50 Ill. 169.) ▉ And even assuming that the trial court should have been more liberal in its rulings on cross-examination, in permitting defendants to introduce certain evidence showing the circumstances leading up to the activities of Rocca, an examination of the entire testimony given by the witness discloses that all the facts surrounding the matter were eventually laid before the jury, and consequently defendants could not have been prejudiced by the rulings complained of.

▉ Plaintiff alleged in its complaint that it was ready, able and willing to perform the contract according to its terms; but defendants claim that no evidence was offered to substantiate such allegation, and that consequently plaintiff failed in its proof. In support of this contention defendants have cited a number of cases involving ordinary contracts of purchase and sale in which it is held generally that in order that one party may place the other in default upon a contract consisting of mutual dependent obligations, he must not only be able to perform, but must offer to perform. (*Hanson* v. *Slaven,* 98 Cal. 377 [33 Pac. 266].) But the record in the present case is not barren of such proof for it discloses that while Jacob Kagan was testifying as a witness plaintiff's counsel elicited from him the admission that during certain court proceedings in Vancouver growing out of this controversey counsel for plaintiff there stated to him that plaintiff was at all times ready, able and willing to pay one-half of the purchase price of said material. Assuming, however, as defendants argue, that the foregoing testimony is legally insufficient to prove the facts mentioned, it would seem that under the circumstances of this case such proof was not essential, for in the first place, under the provisions of section 1440 of the Civil Code, if one party to a contract or agreement gives notice that he will not perform, the other party is excused from making an offer to perform; and while there was no express notice given by the Kagans that they would not proceed with the joint adventure, their actions in violating the fiduciary relationship in secretly acquiring the property on

their own account, to the exclusion of plaintiff, rendered it impossible for them to perform. ▇▇▇ Secondly, it is unquestionably well settled that the strict rules governing in cases of ordinary contracts, which defendants seek to invoke here, have no application to cases of agreements involving the fiduciary relationship, such as copartnership, joint adventures and the like, particularly where, as here, the party in whose behalf the rule is sought to be invoked first violated such relationship by acquiring interest antagonistic to his coadventurers, and thus prevented the accomplishment of the object for which the joint adventure was formed. One of the leading cases upon the subject is *Saunders* v. *McDonough, 'supra,* and it was there said: "It (the rule mentioned) cannot be justly applied, and we believe it has never been applied, to obligations arising out of partnerships or quasi partnerships, which are founded upon trust and confidence, and which, without some express stipulation, are not presumed to exact, as conditions precedent to the continuance of the relation and the enjoyment of its fruits, the prompt and equal discharge, or readiness to discharge, by each partner or associate, of his various obligations concurrently with the occasion. For his defaults of duty a partner may be taxed with the loss he inflicts upon the business; and in grave cases the partnership may be dissolved by judicial decree; but it is not dissolved *ipso facto.*" To the same substantial effect are *Botsford* v. *Van Riper,* 33 Nev. 156 [110 Pac. 705], and *Miller* v. *Walser, supra.* The question of the application of the rule arose in this state in the case of *Andrews* v. *Bush, supra,* under circumstances somewhat similar to those presented, but the court refused to apply it. Even assuming that grounds may exist for applying such rule in exceptional cases such as suits in equity wherein the purpose of the joint adventure is substantially accomplished, but the plaintiff claims he has not received his share of the alleged profits, we have no such situation here.

The assignments of error relating to the instructions involve only those questions of law which have already been discussed and disposed of, and consequently they are to be

governed by the views already expressed and do not require further notice.

The judgment is affirmed.

Tyler, P. J., concurred.