## JOSEPH v. SULZBERGER.

(Supreme Court, Appellate Division, First Department. February 4, 1910.)

1. JOINT ADVENTURES (§ 5*)—BREACH OF CONTRACT—FORM OF ACTION.

Where two or more people enter into a contract by which one is to buy corporate stock for the joint account of all, and he subsequently refuses to transfer the stock, the remedy of the others is not an action for damages, but is an action in equity.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. § 7; Dec. Dig. § 5.*]

2. CONTRACTS (§ 10*)—VALIDITY—MUTUALITY.

An agreement between plaintiff and defendant, under which defendant agreed to purchase stock in a corporation for the joint account of plaintiff, defendant, and others, and to transfer to plaintiff his proportionate share of the stock on demand, accompanied by payment, but which contained no agreement on the part of plaintiff to take and pay for the stock, is void for want of mutuality.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 26; Dec. Dig. § 10.*]

3. CONTRACTS (§ 168*)—IMPLIED PROVISIONS.

A promise will be implied, where it is plain that it has been inadvertently omitted from the contract, and the facts are such that it can be assumed that the promise would have been made if attention had been called to it; but it will be implied only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties indicate that they intended to effect.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 751; Dec. Dig. § 168.*]

4. PRINCIPAL AND AGENT (§ 85*)—REIMBURSEMENT OF EXPENDITURES BY AGENT—IMPLIED PROMISE.

Where an agent purchases property at the request and for the account of his principal, without any definite promise on the part of the principal to reimburse his agent, the law will imply and enforce such promise.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 224—228; Dec. Dig. § 85.*]

5. CONTRACTS (§ 168*)—CONSTRUCTION—IMPLIED PROVISIONS.

Plaintiff and defendant entered into a contract by which defendant was to purchase stock in a corporation for the joint account of plaintiff, defendant, and others, and agreed to transfer to plaintiff a portion of such stock proportionate to plaintiff's original holding in the corporation, on demand by plaintiff and the payment of the purchase price; but there was no express agreement by plaintiff to take and pay for the stock. *Held,* that such a provision will not be implied; it appearing that the proposition to buy the stock originated with defendant, and that plaintiff neither advocated nor proposed it, but simply acquiesced in the proposition.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 751; Dec. Dig. § 168.*]

6. JOINT ADVENTURES (§ 5*)—BREACH—RIGHT OF ACTION.

A right of action for breach of a contract by defendant to purchase corporate stock for the joint account of plaintiff, defendant, and others accrues when plaintiff demands a fulfillment of the contract to transfer to plaintiff his proportionate share of the stock, and defendant refuses.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. § 7; Dec. Dig. § 5.*]

7. DAMAGES (§ 62*)—BREACH OF CONTRACT—DUTY TO MINIMIZE DAMAGES.

Where a contract, under which defendant agreed to purchase corporate stock for the joint account of plaintiff, defendant, and others, and transfer

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

to plaintiff his proportionate share on demand and payment of the purchase price, is breached, it is plaintiff's duty to minimize the damage so far as is reasonably possible; and he cannot, by inexcusable neglect, permit his damage to grow, and then charge it all to the other party.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 128–131; Dec. Dig. § 62.*]

8. DAMAGES (§ 126*)—CONTRACTS FOR PURCHASE OF STOCK—BREACH—DAMAGES.
　　Where a contract under which defendant agrees to purchase corporate stock and transfer a part thereof to plaintiff is breached, and defendant refuses to transfer the stock, the measure of damages, where the stock can be purchased in the market, is the difference between the contract price and the price at which the same stock could be bought in the market within a reasonable time after the breach; and if the stock is not for sale on the open market, but plaintiff could have acquired the shares from another stockholder, the price at which he could have bought the stock may be substituted for the market price, and the damages cannot be arrived at by considering the book value of the stock.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 349; Dec. Dig. § 126.*]

Appeal from Trial Term, New York County.

Action by Frederick Joseph against Ferdinand Sulzberger. Judgment for plaintiff, and defendant appeals. Reversed.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, McLAUGHLIN, and DOWLING, JJ.

Paul D. Cravath, for appellant.
Samuel Untermyer, for respondent.

SCOTT, J. This is an appeal by defendant from a judgment for a substantial sum as damages for the refusal to deliver to plaintiff certain shares of the capital stock of the Schwarzchild & Sulzberger Company pursuant to an oral contract alleged to have been entered into between the parties in 1898. The complaint contains some allegations which would be pertinent to an action for conversion of the stock, but it was expressly stipulated upon the trial that plaintiff sought to recover damages for breach of a contract to deliver. The Schwarzchild & Sulzberger Company (hereinafter termed, for convenience and brevity, the "Company") was organized in 1892, with an authorized capital stock of $5,000,000, of which about $4,300,000 had been issued and was outstanding during the period of the events leading up to this action. The plaintiff and the defendant and one Samuel Weil were in 1898 directors and shareholders in the Company, defendant owning 21,937½ shares, plaintiff 7,312½ shares, and Samuel Weil 3,662½ shares. These shares will be termed for convenience the "original" shares or holdings. Of the stock issued upon the organization of the Company about $1,000,000 had been issued to acquire the Phœnix Packing Company. This stock was held in comparatively small lots, mainly in New England, and has been referred to throughout the case and will be hereafter referred to as the "New England stock." In 1898 a project was conceived for acquiring as much as possible of this New England stock. The Company, although making large profits, had for about a year discontinued the payment of dividends, and it was not proposed to pay any for still another year at

least. It is at this time, and with reference to this stock to be acquired, that the plaintiff alleges the contract sued upon was made. It is of importance to consider his allegations in that behalf, in connection with the evidence, because it is of vital importance to determine at the outset whether any enforceable contract was made, and, if so, whether it was the precise contract sued upon. The allegation of the complaint is:

"Second. On or about the 1st day of February, 1898, the plaintiff, the defendant, Samuel Weil, and Cyrus S. Hapgood were stockholders of the Schwarzchild & Sulzberger Company, and were desirous of increasing their holdings in the capital stock thereof, and entered into an agreement, for valuable consideration, wherein and whereby it was agreed that the defendant should purchase from time to time additional amounts of stock of said Company for himself, the plaintiff, and said Weil and Hapgood, respectively, in proportion to their respective holdings of stock of said company; that is to say, said stock to be so purchased was to belong to each of said four persons in several shares in the same relative proportion as the amount of stock standing in the name of each of said four persons bore to the aggregate amount of stock standing in the names of all of them; and it was further agreed that the defendant should advance all moneys required to pay for said stock, or procure the cost price of said stock, or so much as might be required by defendant, to be advanced by banking houses or others; that the shares of stock belonging to each of said four parties should be carried or caused to be carried by the defendant for the account and risk of each of the owners thereof, including the plaintiff; and that the defendant would deliver to the plaintiff his share or proportion of the stock so purchased as aforesaid at any time upon payment to defendant of the actual cost of the plaintiff's share of such stock plus the pro rata amount the defendant should then have paid for carrying the same, or, if he should personally have carried said stock, then at a rate not to exceed 6 per cent. per annum to the time of the delivery of the stock to plaintiff, less any dividends declared and paid thereon; and it was further agreed that the defendant would deliver to said Weil and Hapgood their respective proportions of said stock upon demand and upon similar conditions; and the plaintiff and said Weil and Hapgood each agreed that upon demand he would pay to defendant his proportion of the sums advanced or laid out in the purchase of such stock as aforesaid, and to which defendant was entitled under said agreement, less the dividends declared and paid thereon, upon delivery by defendant to each of them, respectively, of his proportionate share of said stock."

At the trial the plaintiff was the sole witness as to what the agreement was between the parties. The defendant was said to be in Europe, and Weil and Hapgood, although present in court, were not called as witnesses by either party. The plaintiff's version of the agreement was as follows:

"In 1898 I had a talk with Mr. Sulzberger about this stock that was in New England, that had been given to the New England people for the Phœnix Packing Company's business. I recollect the occasion. I had several talks. The time in 1898 when I had the first talk about this New England stock was, I think, in the end of 1898, when Mr. Sulzberger, Mr. Weil, Mr. Hapgood, and myself were at the meeting of directors of the company. Just what took place was Mr. Sulzberger and Mr. Hapgood talked together about buying the stock, the pool stock, the stock of the company, the New England stock. I remember the substance of what took place. The substance was that Mr. Sulzberger said to Mr. Hapgood that now we can buy the stock for a low figure on account there is no dividend going to be paid. There had not been any paid for a year. The concern had been making money, a great deal of money. I mean the corporation. Mr. Sulzberger told Mr. Hapgood that on account there is no dividends going to be paid he can buy the stock cheap, at a very low figure. He give them orders to buy it. Mr. Hapgood said: 'I think I can do that. If you

leave it to me, I can buy that stock.' Mr. Sulzberger told Mr. Hapgood, whenever he buys any stock, to telephone him, and draw on him with the stock attached. He told him to send it to some bank downtown or to his office. Mr. Sulzberger says that he don't want to be known in the transaction; that Mr. Hapgood shall go in the market and buy the stock as cheap as possible, as he cannot afford to be known in this transaction on account of not going to pay any dividends. Mr. Sulzberger said to Mr. Hapgood in my presence and Mr. Weil's presence that the stock is to be bought and divided on pro rata to each man's holdings of the stock, and he will hold that stock, he will carry it, for 6 per cent. interest. That ended the conversation at that time, and then it came always up again when Mr. Hapgood was present. The subject was referred to again at other conversations. Mr. Sulzberger said to me and Mr. Weil we were to have an interest in the stock, pro rata to our holding of stock in the company. Our holdings of stock were as I have stated them here."

It is noticeable and significant that the plaintiff does not say, in the portion of the evidence quoted above, that he, or Weil, or Hapgood agreed on their part that they or either of them would take the proportionate part of the stock to be purchased, and would pay to defendant on demand, or at any time, their proportionate share of the cost of acquiring the stock and the carrying charges thereon; and although the plaintiff was examined and cross-examined and re-examined at great length he did not at any time testify that he had agreed, on his part, to take and pay for any portion of the stock to be acquired. In another part of the testimony he gives a slightly different version of the agreement respecting the New England stock, saying:

"The arrangement between myself and Mr. Sulzberger and Mr. Weil and Mr. Hapgood regarding the so-called pool stock was that the pool stock was to be bought by Mr. Hapgood, and to be paid for by Mr. Sulzberger, and to be carried at 6 per cent. for the joint account of Mr. Hapgood, Mr. Weil, and myself and himself. We were not asked to provide any of the money. Mr. Sulzberger says he will advance the money and carry the stock for 6 per cent. That was the arrangement."

The difference between the two versions of the agreement sued upon is important. The court charged, without objection from the plaintiff, that plaintiff could not recover in this action if the so-called "pool" or New England stock was purchased and held for the joint account of all the parties to the alleged contract. This constituted the law of the case, and the instruction was doubtless correct; for, if the transaction had been one for the joint account, the remedy would have been by an action in equity. Ross v. Willet (General Term, First Department) 76 Hun, 211, 27 N. Y. Supp. 785.

The foregoing comprises all of the oral testimony to be found in the case as to the precise terms of the alleged oral contract. It was, however, referred to in certain documents which were read in evidence. In March, 1902, the plaintiff and the defendant and Samuel Weil signed an agreement relative to the management of the Company and their relations with each other. It was agreed that neither should sell any portion of his original holdings without first affording the other an opportunity to buy; that plaintiff and Weil should each receive a certain salary; that dividends should be paid, if the net profits came to a certain sum in any year, and the like. This agreement never became operative, because it was conditioned upon the consummation of a pending plan for the issue of preferred stock, which was never consummated. It was introduced, therefore, not because it established

a new contract between the parties respecting the distribution of the New England stock, but because one of its clauses, which evidently referred to that stock, was deemed to constitute a formal admission as to what the oral contract in that regard had been.    That clause read as follows:

"Sixth. It is further understood and agreed that if any of said parties to this agreement shall purchase or acquire any shares of stock, or shall have heretofore acquired any shares of stock, whether the same have heretofore been issued or whether the same may be hereafter issued, other than their original holdings as hereinabove set forth, then in that event the others of said parties, or either of them, shall be entitled to participate in such purchase at the same price that is paid therefor pro rata as the amount of his stock bears to the holdings of the others of said parties; it being the intent hereof that, in all holdings of shares of stock of Schwarzchild & Sulzberger Company heretofore or hereafter acquired (other than their original holdings as above set forth), the parties shall participate pro rata according to the amount of their several holdings, upon the same terms that the parties so purchasing may have acquired the same, and it shall be the duty of the said party or parties so acquiring said stock in said Schwarzchild & Sulzberger Company to offer participations therein to the others of said parties as aforesaid."

It will be observed, upon a careful reading of this clause, that it states the agreement respecting the New England stock precisely as plaintiff had stated it upon his oral examination.    It emphasizes the obligation resting upon the party who shall have or shall purchase shares of stock other than his original holdings to allow the others to participate, and to offer them an opportunity to do so; but it is entirely and significantly silent as to any obligation on their part to accept such participation, or as to any right of the party purchasing to demand that the other parties should participate.    In August, 1902, the defendant, then owning and holding more than a majority of the stock of the company, entered into an agreement (which was not carried out) with several of the largest competitors in the business looking to a consolidation of interests and the organization of a new corporation to take over the plants and business of the several signers.    He agreed to turn over his stock in the new company to the new corporation for $190 per share and a certain amount of new stock, and reserved the right to put in the stock then held by plaintiff and Weil upon the same terms.    He thereupon, and on September 10, 1902, entered into certain written contracts with plaintiff and Weil, one of which referred to the New England stock acquired by plaintiff in the following terms:

"Whereas, said Frederick Joseph and Samuel Weil are interested in the profits which may be made on 3,300½ shares, being the difference between 25,238 shares agreed in said August contract to be deposited in said Trust Company, and 21,937½ shares, part of 22,090½ shares heretofore by said Sulzberger deposited in said Trust Company."

This recitation, while not inconsistent with the existence of such a contract as is alleged in the complaint, does not tend to prove it, for it is equally consistent with either of the agreements testified to by plaintiff; i. e., an agreement on defendant's part to permit plaintiff and Weil to participate in the purchase of the stock, without any corresponding obligation on their part so to participate, or an agreement that Sulzberger should acquire and hold the stock for joint account of

himself, plaintiff, Weil, and Hapgood. This agreement, therefore, fails to furnish evidence of the missing element of the contract sought to be enforced in this action; that is, the agreement on plaintiff's part to take upon demand, or at any time, and to pay for, his proportion of the New England stock acquired by defendant. The record contains a number of self-serving documents and letters signed by plaintiff or written in his behalf long after the making of the contract of 1898. They were all prepared by lawyers, doubtless by plaintiff's instructions; but as evidence of what the contract really was they are wholly valueless.

As the case stood, then, at the close of the evidence, the only contract which had been proven in any way resembling that set forth in the complaint was an agreement on the part of defendant that he would purchase and carry so much of the New England stock as could be procured, and that such stock should be divided pro rata between the parties to the agreement; but no agreement had been shown on the part of plaintiff, or of Weil or Hapgood, that either of them would at any time take his pro rata share of such stock and pay his proportion of the cost and carrying charges. Such an agreement was wholly unilateral, and involved no obligation on plaintiff's part which the defendant could have enforced. There was no consideration to support defendant's promise, and it cannot be enforced. Chicago & Great Eastern Ry. Co. v. Dane, 43 N. Y. 240; Booth v. Milliken, 127 App. Div. 522, 111 N. Y. Supp. 791.

The respondent insists that the use by plaintiff in various parts of his testimony of the words "agreed," "agreement," and "arrangement" imports a reciprocal undertaking on his part to take and pay for his pro rata proportion of the New England stock on demand. We are unable to draw any such inference. In using the words quoted the plaintiff was referring to the agreement which he testified to, and the terms he used in so referring to it added nothing to the version which he gave of it. Nor are we able to accept the further contention of the respondent that there must be implied in the agreement as testified to a reciprocal undertaking on plaintiff's part to take and pay for his pro rata proportion of the New England stock. It is quite true that unexpressed promises will often be implied, where it is plain that they have been inadvertently omitted from the contract, whether written or oral, and the facts are such that it can be assumed that the promise would have been made if attention had been called to it. It may, however, be implied only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties indicate that they intended to effect. Genet v. Del. & Hudson Canal Co., 136 N. Y. 593, 32 N. E. 1078, 19 L. R. A. 127. Such a case is presented where an agent purchases property at the request and for the account of his principal. Although there may not be any definite promise on the part of the principal to reimburse his agent, the law will imply and enforce one. Markham v. Jaudon, 41 N. Y. 235.

This is no such case. Sulzberger did not act as plaintiff's agent, nor at plaintiff's request. The proposition to buy the New England stock originated with Sulzberger himself, and, so far as appears, plaintiff neither advocated nor opposed it. His position was that of silent ac-

quiescence, and it may well be that when the agreement was made, in 1898, plaintiff considered that it was favorable to himself, because it imposed no obligation upon him. To read an implied promise on plaintiff's part into the agreement as proven would be, not merely to supply a term evidently omitted by inadvertence, but to make a contract for the parties. We are, therefore, forced to the conclusion that the plaintiff failed to prove the contract alleged in his complaint. The defendant's motion for a dismissal of the complaint should, therefore, have prevailed.

Having arrived at that conclusion, it is unnecessary to consider the rulings which preceded the submission to the jury of the question whether or not the contract alleged in the complaint had been proven, or the charge of the court upon that subject. But, since the views already expressed will necessitate a retrial, it is proper to deal with the question as to the measure of damage, to which a large portion of the briefs and arguments have been devoted. If the defendant ever made an enforceable contract to deliver New England stock to plaintiff, that contract was broken, and plaintiff's right to damages arose when he demanded fulfillment of the contract, and defendant refused. The evidence as to when such demand and refusal occurred is not clear; the plaintiff himself fixing various dates, but none later than December, 1905. Whenever the breach occurred, it was plaintiff's duty to minimize the damages so far as reasonably possible, and he might not, by inattention, want of care, or inexcusable neglect, permit his damage to grow, and then charge it all to the other party. Parsons v. Sutton, 66 N. Y. 92.

The subject of the contract alleged in the complaint was stock of an incorporated company, and the damages ordinarily allowed for the breach of a contract to buy or sell such stock is the difference between the price stated in the contract and the price at which the same stock could be sold or bought in the market within a reasonable time after the breach. There was no open market for the stock of the company in this case, in the sense that it was dealt in or quoted upon any stock exchange; but it appeared that the plaintiff, if he desired to acquire the number of shares of stock when he demanded from defendant, could have procured an equal number of shares from a member of the Schwarzchild family at $175 per share. He had a contract to that effect running beyond the latest date which he fixes as that of the breach, and his own evidence shows that he was being importuned by Schwarzchild to take the stock at the price mentioned. Of course, he was not bound to buy that stock; but the opportunity to buy it served to fix and limit the damage he suffered by reason of defendant's refusal to deliver.

The method of fixing damages adopted at the trial was to introduce in evidence the balance sheets of the company for a number of years, including that for the year subsequent to the breach. These served to show what is called the "book value" of the stock, which is not always the equivalent of the market value. This method of ascertaining the value of stock or bonds is sometimes resorted to, but only when there is no evidence obtainable of the value of the bonds or stock, as such. Industrial & General Trust Co. v. Tod, 180 N. Y. 215;

73 N. E. 7. It was not necessary or proper to resort to such evidence in the present case, because there was ample evidence that, so far as plaintiff was concerned, there was a market in which he could have acquired the stock which the defendant had refused to deliver.

It is unnecessary to consider further the numerous exceptions with which the record abounds.

For the reasons above stated, the judgment must be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.