### JERMYN v. SEARING et al.

(Supreme Court, Appellate Division, First Department. December 30, 1915.)

1. CONTRACTS ⬥94—CANCELLATION—CONSIDERATION.

A banking partnership, in order to form a syndicate to acquire the bonds of a railroad company, prepared an agreement to form a syndicate for the purchase, in consideration of the mutual promises, the syndicate to be divided into 600 shares, of $9,500 each; subscribers agreeing to take the number of shares and to pay the amounts set opposite their names. The partners agreed to issue to the subscribers, upon payment of their subscription, negotiable receipts, and on failure of any subscriber to perform any of his undertakings the partners might exclude such subscriber. It was represented to plaintiff, who signed the agreement, that the partnership controlled all of the bonds, and the agreement declared that it should not be binding until the entire amount was subscribed. *Held*, that where the statement that the partnership controlled all the bonds was untrue, and no consideration was paid or received by plaintiff for signing the syndicate agreement, it could not be enforced by the partnership as against him, after his notice of cancellation had been given to the partnership.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 420–430, 1160, 1164, 1165; Dec. Dig. ⬥94.]

2. CONTRACTS ⬥10—VALIDITY—MUTUALITY.

In such case, as all of the promises were by the subscribers, and none by the partnership, the contract was bad for want of mutuality.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 21–40; Dec. Dig. ⬥10.]

3. PRINCIPAL AND AGENT ⬥148—LIABILITY OF PRINCIPAL—SUBSEQUENT AGREEMENTS.

As the agreement showed on its face that it was unilateral and did not authorize the partners to borrow money, plaintiff was not liable to a bank, which lent the partnership money, receiving the subscription agreement as collateral, on the theory that he had clothed the partnership, as his agent, with power to do an act upon which third persons could rely; this being particularly true as the proceeds of the loan from the bank were not used for the syndicate purposes, but were partly used to pay pre-existing indebtedness.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 534–552; Dec. Dig. ⬥148.]

4. PLEDGES ⬥58—RIGHTS OF PLEDGEE—ACTION—DEFENSES.

As the syndicate agreement did not authorize the partners to borrow money, and as its want of mutuality appeared on its face, all defenses available against the partnership were available against the bank, which received it as collateral, though it took in good faith; the agreement being nonnegotiable.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 186–194; Dec. Dig. ⬥58.]

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from Trial Term, New York County.

Action by Joseph J. Jermyn against Frederick P. Searing and others, composing the firm of Searing & Co., and the Empire Trust Company, to enjoin defendants from assigning or pledging an instrument in the nature of a syndicate agreement, from instituting an action thereon, and for cancellation and delivery over of the instrument as void. From a judgment for plaintiff, the last-named defendant appeals. Affirmed.

See, also, 160 App. Div. 832, 146 N. Y. Supp. 57.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

William D. Guthrie, of New York City (Thomas F. Gilroy, Jr., and Abraham Tulin, both of New York City, on the brief), for appellant.

Rush & Hare, of New York City (Montgomery Hare, of New York City, of counsel, and William R. Barbour and Effingham N. Dodge, both of New York City, on the brief), for respondent.

CLARKE, J. This is an action in equity against the persons formerly constituting the banking firm of Searing & Co. and the Empire Trust Company to secure the cancellation and surrender of a certain subscription or syndicate agreement dated March 12, 1907, for the purchase of $6,000,000 of bonds of the then proposed Delaware & Eastern Railway Company, on the ground that the plaintiff's subscription thereto had been obtained by false representations by Searing & Co. and without consideration; that the plaintiff, having learned and been informed, 16 days after he had subscribed to the aforesaid syndicate agreement, that the representations made to him were false, on March 28, 1907, revoked and canceled in writing his subscription; that the organization of the railroad corporation, $6,000,000 of the bonds of which constitute the subject-matter of the syndicate agreement, was null and void; that the Empire Trust Company, having knowledge or notice of the foregoing matters constituting ground for the revocation and cancellation of said subscription, loaned to Searing & Co. the sum of $150,000, and received as collateral security for said loan the aforesaid instrument in writing executed by the plaintiff, which he had canceled; that no syndicate has ever been formed to acquire the aforesaid $6,000,000 of bonds, and that any plan or design which the firm of Searing & Co. may have had to form any such syndicate has long since been abandoned; and that the said Searing & Co. never acquired for themselves, or for any other persons for whom said firm was acting as agent, a right to control said $6,000,000 worth of bonds.

The defendant Empire Trust Company in its answer set up a counterclaim, asking a money judgment for $150,000 and interest, basing its claim on a loan alleged to have been made for plaintiff's credit and account by Searing & Co., who were named as syndicate managers in the agreement. The plaintiff in his reply set up as a first defense the various matters alleged in the complaint as grounds for the cancellation of the subscription agreement, and for a second separate defense an express agreement with the plaintiff at the time he signed the syndicate agreement that the same should not be binding upon him until the whole $6,000,000 of bonds had been subscribed for, and for a third

separate defense that said syndicate agreement bore on its face the implied condition to that effect. The Special Term rendered judgment for the plaintiff, directing the cancellation and surrender of the instrument sued on, and dismissed the counterclaim of the Empire Trust Company. Defendants composing the firm of Searing & Co. do not appeal; the defendant Empire Trust Company does.

The defendants Searing & Co. were bankers. The plaintiff, who lived at Scranton, Pa., was a man of means, interested in coal properties for over 40 years, and in various other business concerns. The Delaware & Eastern Railroad Company was a railroad corporation, organized under the laws of the state of New York in November, 1904, having an authorized capital of $600,000, divided into 6,000 shares, and, as the court found, had in January, 1907, constructed and owned a line of about 48 miles of railway in the county of Delaware, N. Y., extending from Arkville to the village of East Branch, including a branch from Shavertown to Andes.

Before the transaction here complained of, and in May, 1905, the plaintiff had been informed of the project of said railroad by Searing, and had gone over the proposed line. In June, 1905, he subscribed a syndicate agreement for $100,000 face value of the bonds of this railroad company, $600,000 par value of which, out of a total issue of $1,000,000, were being placed by Searing & Co. as syndicate managers, and he paid his subscription in cash and received $100,000 face value of said bonds and a bonus of 250 shares of the stock. The Empire Trust Company was the trustee under the mortgage executed January 1, 1906, to secure these bonds. He also then secured the right to subscribe to one-sixth of the capital stock of a milk company, which it was proposed to organize in conjunction with and to operate on the line of said railroad. Thereafter the milk company was organized, and plaintiff subscribed and paid for $10,000 par value of its capital stock. Thereafter the plaintiff was requested by Searing & Co. to purchase or to join a syndicate for the purchase of more bonds of the same issue. The plaintiff declined to do so, but, being further urged, in August, 1906, agreed to execute a note or notes for the purchase price of $100,-000 of Delaware & Eastern Railroad Company bonds, with $25,000 par value of stock of said company, said notes to amount to $95,000, upon the agreement of Searing & Co. that Phillips should undertake the sale of said bonds and have all the cash profit over and above the price of 95 per cent. of their par value and interest; it being a part of said agreement that the plaintiff should not pay for said bonds and stock in cash, but that $85,000 of the purchase price of said bonds and stock would be provided by the defendant Empire Trust Company upon the delivery to it of the plaintiff's note for that amount, with said $100,000 par value of said bonds as collateral security, and that $10,000 and the remainder of said purchase price would be provided by the Newton Trust Company of Newton, N. J., upon the delivery to it of the plaintiff's note for that amount. It was further a part of said agreement that said note of the plaintiff payable to the Empire Trust Company should be payable on demand, in order that, as the bonds pledged as collateral therefor were sold, the proceeds thereof could

and should be applied upon the said note payable to the Empire Trust Company. Pursuant to this agreement the plaintiff on the 15th of August, 1906, signed a three-months note in favor of the Newton Trust Company for $10,000, and a demand note in favor of the Empire Trust Company for $85,000, and interest. Said notes were delivered to the respective payees therein named, and $100,000 par value of Delaware & Eastern Railroad Company bonds were delivered to the Empire Trust Company as collateral security for the payment of the plaintiff's said note for $85,000.

The court has found: That in the summer of 1906 Searing & Co. purported to incorporate the Schenectady & Margaretville and the Hancock & East Branch Railroad Companies. That before the filing of the certificates of incorporation Searing & Co. formed the intention of organizing a railroad corporation under the laws of the state of New York, which should be formed by merging or consolidating into one corporation the said two roads, and that said consolidated company should by lease or otherwise acquire said Delaware & Eastern Railroad Company, or all its property and franchises. That with the purpose of obtaining funds or money with which to consummate and render effectual the plan they caused to be printed a certain paper entitled "Delaware & Eastern *Railway* Company, Syndicate Agreement." That Jermyn did not learn of any plan to construct the lines of railway of said two companies until November, 1906, and then believed them to be proposed extensions of said Delaware & Eastern Railroad Company. That about March 12, 1907, Searing & Co., acting through Phillips, represented to the plaintiff, in Scranton, that they had themselves, and in connection with other parties for whom they were acting as agents, acquired the right to the control of $6,-000,000 of the 5 per cent. bonds of a company then about to be formed, to be known as the Delaware & Eastern Railway Company, or by some other name, and desired and intended to form and were forming a syndicate to purchase said $6,000,000 of bonds of said company, representing that said bonds were to be issued for the purpose of constructing a line of railway from Hancock to Schenectady, in the state of New York, by acquiring all the stock and all the bonds of the Hancock & East Branch Railroad Company and the Schenectady & Margaretville Railroad Company, and all the rights, privileges, and franchises of said two last-named companies, and also for the purpose of acquiring by lease or otherwise the said Delaware & Eastern Railroad Company, stated to be then already constructed and operating, and presented to plaintiff the "Syndicate Statement" and the paper entitled "Delaware & Eastern Railway Company, Syndicate Agreement," and requested plaintiff to subscribe said "Syndicate Agreement" and agree to become a member of the proposed syndicate by subscribing for 20 shares of said syndicate, or for $200,000 par value of the bonds therein proposed to be purchased by said syndicate and $50,000 of the stock of the proposed new company. That the plaintiff declined to sign said agreement, or to agree to become a member of the proposed syndicate described therein, except upon the express condition that his execution of said agreement should not be binding upon

him unless or until all the shares of the proposed syndicate described therein, or all the $6,000,000 of the bonds of the proposed railway company described therein, should be subscribed for. That the said Phillips, being then a member of the firm of Searing & Co. as constituted on said 12th day of March, 1907, accepted said condition on behalf of said Searing & Co. That thereupon the plaintiff, in reliance upon the acceptance of said condition, and believing and relying upon the said representations, and induced thereby, did subscribe the same, and offered thereby, upon the condition aforesaid, to take and pay for $200,000 par value of said bonds of said proposed Delaware & Eastern Railway Company and $50,000 of the stock thereof, upon the terms set forth in said "Syndicate Agreement"; said subscription being made by him upon said express condition and in reliance upon said representations. That no consideration was paid to or received by the plaintiff for his execution of the said "Syndicate Agreement." That the representations upon which plaintiff relied were false, and known to Searing & Co. to be false, in this, to wit: That it was not true that the said Searing & Co., either in their own right or in connection with others, for whom they were acting as agents, had acquired the right to the control of the $6,000,000 of bonds of the proposed Delaware & Eastern Railway Company, and that it was not true that the said Searing & Co. were then forming or had formed a syndicate to purchase $6,000,000 of bonds of the said company.

This agreement was signed on the 12th of March, 1907. Plaintiff came to New York on March 26, 1907, in response to a demand of Baldwin, president of the Empire Trust Company, that the plaintiff pay to that company the demand note for $85,000 which he had delivered on or about August 5, 1906, as before pointed out. Plaintiff complained of the failure of Phillips, or Searing & Co., to sell the bonds which were lodged with the Empire Trust Company as security, and thus reduce the indebtedness, but promised to make a payment of $30,000 in a few days and to pay the balance in installments. On April 1, 1907, plaintiff sent $30,000 to the Empire Trust Company, and $40,000 on the 15th of July, and $15,000 on the 20th of August, in payment of his $85,000 note; that is to say, plaintiff had fully carried out all of his engagements with Searing & Co. and the Empire Trust Company, entered into prior to the syndicate agreement at bar. On Saturday, March 30, 1907, Searing wrote to Baldwin, the president of the trust company, a letter referring to the terms of a loan of $150,000 proposed to be made by the Trust Company to Searing & Co., and on April 2, 1907, the Empire Trust Company loaned $150,000. It drew its check upon the Hanover National Bank, payable to the order of Searing & Co., which check was forthwith deposited by said Searing & Co. with the Empire Trust Company; the amount of said loan being credited by said Empire Trust Company in an account called the Searing & Co. Special Account. Searing & Co. gave a three-months note, signed by them as Delaware & Eastern Railway Bond Syndicate, by Searing & Co., Syndicate Managers, which recited having deposited or pledged with said company, as collateral security for the payment of this note, or any other liability or

liabilities, the following property, namely, underwriting agreement signed by J. J. Jermyn, of Scranton, Pa., to subscribe and pay for $200,000 par value of Delaware & Eastern Railway Company first year 5 per cent. bonds.

The court found: That at no time prior to the making of this loan on April 2, 1907, was any mention made by the defendant Searing, or by or to Baldwin, then president of the Empire Trust Company, in the presence or hearing of the plaintiff, of any plan, design, or intention of said Searing, or of the firm of Searing & Co., individually or as syndicate managers, to apply to said defendant trust company for a loan of any sum of money. That at no time prior to March 4, 1908, was it made known to the plaintiff that such a loan had been requested or had been made. That on the 26th day of March, 1907, when plaintiff was in the city about his demand note for $85,000, Phillips had in his possession at Scranton the syndicate agreement, and presented it to the Dime Deposit & Discount Bank of Scranton, and requested a loan of $50,000 on the security thereof, which was refused, unless the plaintiff should approve the same. The fact of said application was communicated to the plaintiff by said bank, which inquired whether the plaintiff desired his subscription discounted, and the plaintiff, on being so informed, said that he did not, and the bank thereupon refused to make the loan. That on March 28th he had an interview with defendant Phillips, in which he denounced Phillips for noncompliance with the condition upon which the plaintiff had signed the so-called syndicate agreement, and complained of Phillips' efforts to obtain a loan upon the said syndicate agreement, and at this interview the plaintiff said to said Phillips, referring to said agreement:

"I cancel this right here now, I will have nothing more to do with you."

And on March 28th, after having stated thus to Phillips, he wrote to the firm of Searing & Co. a letter canceling said syndicate agreement, which letter was received at the office of Searing & Co. in due course of mail, and was seen and discussed by the defendants Searing and George prior to April 2, 1907. The note for $150,000 to the Empire Trust Company was renewed from time to time down to the one which matured on March 2, 1908. This last note was not paid, and on March 4th a new note for the same amount, but payable on demand, was executed and delivered. No part of the principal of said notes has ever been paid, but the interest to December, 1909, was paid by Searing & Co.

The court found:

"That neither the firm of Searing & Co. as it was constituted on March 12, 1907, nor any firm which after that date did business under that name, were at any time contractors for the construction or the building of the railroad mentioned in the seventh paragraph of said syndicate agreement, nor did any firm at any time doing business under the name of Searing & Co. execute any contract of agreement for the building thereof. That no person except the plaintiff was ever asked to sign said syndicate agreement. That no portion of the railroad referred to in the seventh paragraph was ever constructed. That the so-called Delaware & Eastern Railway never owned or held any property of any substantial value."

The court found as conclusions of law:

"The so-called syndicate agreement signed by the plaintiff on March 12, 1907, was not then and never thereafter became binding upon the plaintiff, for the reason that the terms of said agreement imported or implied the condition that it should not be binding upon any subscriber unless or until all the shares of the syndicate therein described or proposed should be subscribed for, or all of the $6,000,000 of bonds therein referred to should be subscribed for.

"(2) The so-called syndicate agreement signed by the plaintiff on March 12, 1907, having been signed by him upon the express condition that the same should not be binding upon him until all the $6,000,000 of bonds therein mentioned should be subscribed for, which condition was accepted by Searing & Co., by whom the plaintiff's subscription thereto was solicited, was not then binding upon the plaintiff, and could not bind him until said condition was complied with."

It also found:

"No power or authority was by said syndicate agreement, dated March 12, 1907, and signed by the plaintiff, conferred upon the firm of Searing & Co. to borrow money either as syndicate managers or otherwise. That plaintiff's notice terminated any obligation which had been incurred by his signature of said syndicate agreement. The defendant Empire Trust Company never made any advance to a contractor or contractors or a construction company at any time formed to build the railroad referred to in the seventh clause of said syndicate agreement. That the defendant Trust Company never acquired any greater or other right to enforce said syndicate agreement against the plaintiff than was possessed or vested in the then existing firm of Searing & Co. on April 2, 1907. That the plaintiff was entitled to judgment in accordance with the prayer of the complaint."

[1] In my opinion the judgment in favor of the plaintiff against the defendants, members of the firm of Searing & Co., and not appealed from by them, was fully justified. So far as they are concerned, the syndicate agreement was invalid for violation of the express agreement entered into when it was signed by the plaintiff, as well as the agreement implied in such an instrument that it should not be binding until all the bonds therein referred to had been subscribed for, and because it had been specifically revoked, orally and in writing, while still in the possession of the defendants Searing & Co., and before any rights or obligations to others had been caused or incurred thereby. The question remains whether such a document, invalid in the hands of Searing & Co., not a negotiable instrument, delivered as collateral security to the Empire Trust Company for a loan of $150,000 made by it to Searing & Co. as syndicate managers of the Delaware & Eastern Railway Company, confers upon the Trust Company a good cause of action for recovery of the amount loaned to Searing & Co.

[2, 3] The Trust Company claims that it is an innocent holder without notice and for value; that by his signature to the syndicate agreement plaintiff constituted Searing & Co. his agent to obtain loans upon his subscription; that such loans were made upon the faith thereof and for the purposes provided in said agreement; and that before the making of said loans the plaintiff confirmed and ratified to it his subscription. The backbone of the appellant's claim is that the underwriting or syndicate agreement signed by the plaintiff conferred upon Searing & Co. clear authority to borrow money upon his account.

Asserting that Searing & Co. were his agents and did borrow the $150,-000 from the Empire Trust Company, they rely upon the doctrine laid down in Bank of Batavia v. N. Y., L. E. & W. R. R. Co., 106 N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440, as follows:

"It is a settled doctrine of the law of agency in this state that where the principal has clothed his agent with power to do an act upon the existence of some extrinsic fact necessarily and peculiarly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, a third person dealing with such agent in entire good faith, pursuant to the apparent power, may rely upon the representation, and the principal is estopped from denying its truth to his prejudice. North River Bank v. Aymar, 3 Hill, 262; Griswold v. Haven, 25 N. Y. 595, 601 [82 Am. Dec. 380]; N. Y. & N. H. R. R. Co. v. Schuyler, 34 N. Y. 30; Armour v. M. C. R. R. Co., 65 N. Y. 111 [22 Am. Rep. 603]. A discussion of that doctrine is no longer needed or permissible in this court, since it has survived an inquiry of the most exhaustive character, and an assault remarkable for its persistence and vigor."

To ascertain whether the appellant's claim is well founded—that is, that the respondent did appoint Searing & Co. his agents to borrow the money loaned by the Empire Trust Company—it is necessary to examine the document. It is as follows:

### "Delaware & Eastern Railway Company.

#### "Syndicate Agreement.

"Agreement made the 12th day of March, A. D. 1907, between Searing & Co., of No. 7 Wall street, New York City, parties of the first part, and the subscribers hereto (hereinafter severally called the 'Subscribers' and collectively the 'Syndicate'), parties of the second part.

"Whereas, the parties of the first part have themselves, and in connection with other parties for whom they act as agent, acquired the right to the control of six million dollars ($6,000,000.00) 5% bonds of a company about to be formed to be known as the Delaware & Eastern Railway Company, or by some other name; and

"Whereas, the parties hereto desire to form a Syndicate to purchase the said six million dollars of bonds of the said company:

"Now, therefore, in consideration of the premises and of the mutual promises herein contained, the parties of the first part, who are to be the Managers of the Syndicate, and the Syndicate mutually have agreed and do agree as follows:

"First. That the said Syndicate shall be divided into six hundred (600) shares of ninety-five hundred dollars ($9,500.00) each, each Syndicate share to entitle the holder thereof on payment of ninety-five hundred dollars in cash to the 'Managers,' to receive when issued ten thousand ($10,000.00), face value, 5% bonds of the said Delaware & Eastern Railway Company, and twenty-five (25) shares of the capital stock, of the par value of one hundred dollars ($100.00) per share.

"Second. The 'Subscribers' covenant and agree to take the number of shares of the said Syndicate and to pay the 'Managers' the amount set opposite their respective names or the amount allotted to them by the 'Managers' as follows: Twenty-five per cent. (25%) upon the signing and delivery of these presents, and the remainder whenever called for by the 'Managers'; it being understood that ten days notice shall be given for the final call.

"Third. The 'Managers' agree to issue to the 'Subscribers,' upon the payment of their subscription, negotiable receipts substantially in the form as follows: [Here follows form.]

"Fourth. In case of the failure of any subscriber to perform any of his undertakings, as or when called for by them, the 'Managers,' on behalf of

themselves and the 'Syndicate,' shall have, and at their sole and exclusive option may exercise, the right to exclude such Subscriber from all interest in the Syndicate, and, at their discretion, without any proceedings at law or in equity, and in such manner as they may see fit, they may sell at public or private sale the shares of such Subscriber and all his rights and interest under this agreement, and in or to any bonds or money that shall be received hereunder, and at any such sale the 'Managers' or any party hereto or any person or persons may become purchasers of any such shares without any accountability, but notwithstanding any such sale, whether public or private, such defaulting Subscriber shall be responsible for all damage caused by any failure on his part. In case the net proceeds of such sale shall be insufficient to pay the amount due on such subscription or subscriptions, then he or they shall and will pay to the 'Managers' the amount of such deficiency and each and every Subscriber signing his or their name hereto, hereby acknowledges his or their deficiency when ascertained.

"Fifth. Each and every 'Subscriber' agrees that the 'Managers' shall have the right to reject or reduce any subscriptions and to allot less than the number of shares hereby subscribed for and also to cancel any and all subscriptions should they for any reason decide to abandon the business.

"Sixth. Each and every 'Subscriber' agrees that the 'Managers' shall have the exclusive right for a period of two years from the date hereof to offer the bonds represented by the Syndicate shares hereby subscribed for to the public at a price not less than par, at which price the 'Managers' shall account to the 'Syndicate' for the proceeds, less one per cent. commission for their services, and each and every 'Subscriber' agrees that during the said period of two years the said bonds shall be withdrawn from sale except by or through the 'Managers' at the price heretofore stated.

"Seventh. It is understood that the bonds of the present underwriting are for the purpose of constructing a line from Hancock, N. Y., to Schenectady, N. Y., by aquiring all the stock and all the bonds of the Hancock & East Branch Railroad Company and the Schenectady & Margaretville Railroad Company authorized by the Board of Railroad Commissioners and all the rights, privileges and franchises now granted to those companies, and also to acquire, by lease or otherwise, the present Delaware & Eastern Railroad Company, already constructed and operating, amalgamating the three railroads into one system, to be known as the Delaware & Eastern Railway Company, or by some other appropriate name.

"And the 'Subscribers' hereto do hereby consent and the 'Managers' are hereby empowered to do any and all acts, to purchase any other securities, and to apply the proceeds of the within underwriting in any manner which, in their judgment, they may deem fit in order to accomplish the above purpose, including the right to arrange for advances to be made from time to time to the contractors or construction company that may hereafter be formed to build the said Railroad, by one or more banks or trust companies, upon the security of this agreement, if necessary, together with the bonds and certificates subscribed for hereunder or that may be purchased by the 'Managers' with the proceeds of the within underwriting. * * * "

After the printed signature of Searing & Co. appeared the following:

| Name. | Bonds Par Value. | Amount to be Paid. |
|---|---|---|
| J. J. Jermyn | $200,000.00 | . . . . . . . . . . . . . . . . . . . . . |

First. There was no consideration paid or passed upon the execution of said instrument by Jermyn.

Second. The only consideration expressed upon the face of such instrument was "the mutual promises herein contained." I have not been able to find any promises made by Searing & Co., with the exception of that contained in the third clause, whereby they agreed to issue to the subscribers, upon payment of their subscriptions, negotiable receipts in the form prescribed. Every other promise and obligation in-

curred was made or incurred by the subscriber. In Commercial Wood & Cement Co. v. Northampton P. C. Co., 115 App. Div. 388, 100 N. Y. Supp. 960, Mr. Justice Ingraham quoted with approval from 9 Cyc. 325:

"A promise is a good consideration for a promise, provided always that it imposes some legal liability on the person making it. If it imposes none, then it cannot be a consideration."

From page 327:

"There are many cases in which, although the offer is definite enough, yet the acceptor by merely accepting has really himself promised nothing in return, has not made himself liable for anything, so that, although one is bound, the other is not, and the engagement lacks what is called mutuality. In such a case there is not an enforceable agreement."

In that case the court held the only possible consideration for the contract under consideration would be assumption of mutual obligations by both the contracting parties which he failed to find.

In Green v. Sigua Iron Co., 88 Fed. 203, 31 C. C. A. 458, the syndicate had no title to the shares proposed to be acquired by the subscribers, the amount which a subscriber might finally acquire was not fixed, there was no promise by the syndicate to deliver any shares, and there was a revocation of a subscription by the subscriber. The court said:

"When it was signed, the syndicate did not have legal title to the shares. * * * It was uncertain how many of the shares were eventually to be taken by the defendant. He promised to purchase a thousand shares, 'or a proportionate part in case of oversubscription.' It was merely an executory engagement for the purchase of shares, which, if it had been valid, would have rendered the defendant liable in damages for a breach upon his refusal to perform. But it was not a valid contract, because of want of consideration. Bish. Cont. § 77. The subscription was a purely unilateral undertaking, without any concurrent undertaking on the part of the syndicate. If the syndicate had refused to transfer the shares to the defendant, and he had sought redress for his damages, it would have been a complete answer to his action that there was no promise on the part of the syndicate to transfer to him any shares. Whether a consideration is necessary to support the promise of a stockholder by subscription, and how the consideration is constituted, are questions which have been much discussed; and, as is said by a recent commentator, 'the courts, in their search for the consideration of such a contract, have indulged in a variety of speculations more curious than useful.' Thomp. Corp. § 1200. The most approved reasoning seems to be that upon the acceptance by the corporation of the subscription the subscriber is immediately invested with the privileges of a stockholder, and the rights thus acquired are a sufficient consideration for his promise. But, as is pointed out by Mr. Morawetz (Priv. Corp. § 134): 'This reasoning has no application in case of a contract to purchase shares, or to become a shareholder in a corporation at a future time. A contract of this description is an ordinary common-law contract, and is subject to all the technical rules governing common-law contracts. The promise to pay for shares, and the corresponding promise to deliver them, or to receive the purchaser as a shareholder, are concurrent, and each constitutes the consideration for the other. Without a consideration neither promise would be binding.' There are unilateral contracts, which are, in effect, a request or proposal to the promisee, in which it is not necessary that the consideration should exist at the time of making the promise, and where, if the promisee acts upon the promise, it becomes obligatory; but in this class of contracts the promisor may always retract before performance by the promisee, and in the intermediate time the promise

is inert. That a unilateral promise to sell cannot be enforced by a party who has not agreed to buy, but subsequently notifies his acceptance of the offer to sell, was decided as long ago as the case of Cooke v. Oxley, 3 Term R. 653. Inasmuch as the defendant retracted his promise before the shares were transferred to him, it is unnecessary to consider whether his subscription can be regarded as belonging to the class of unilateral contracts which have been referred to."

In Chicago & G. E. R. R. Co. v. Dane, 43 N. Y. 240, it was held that an agreement to do an act for another, who assumes no obligation in return, is not binding. Where a carrier agrees to carry goods on certain terms, and the person for whom it agrees to carry them assents to the agreement, but does not promise to ship any goods, there is no contract, because there is no mutuality of obligation. This is so, although at the time of the offer the offerer was engaged in transporting goods for the offeree, and thereafter did so.

In Joseph v. Sulzberger, 136 App. Div. 499, 121 N. Y. Supp. 73, this court said:

That as "the only contract which had been proven * * * was an agreement on the part of the defendant that he would purchase and carry so much of the * * * stock as could be procured, and that such stock should be divided pro rata between the parties to the agreement, but no agreement had been shown on the part of plaintiff" that he would "at any time take his pro rata share of such stock and pay his proportion of the cost and carrying charges, such an agreement was wholly unilateral and involved no obligation on plaintiff's part which the defendant could have enforced. There was no consideration to support defendant's promise, and it cannot be enforced."

The only clause of the instrument which it is possible to invoke in support of the claim of the appellant that it authorized the loan, is the second paragraph of the seventh clause:

"And the 'Subscribers' hereto do hereby consent and the 'Managers' are hereby empowered to do any and all acts, to purchase any other securities, and to apply the proceeds of the within underwriting in any manner which, in their judgment, they may deem fit in order to accomplish the above purpose, including the right to arrange for advances to be made from time to time to the contractors or construction company that may hereafter be formed to build the said railroad, by one or more banks or trust companies, upon the security of this agreement, if necessary, together with the bonds and certificates subscribed for hereunder or that may be purchased by the 'Managers' with the proceeds of the within underwriting."

And the appellant broadly claims that this confers clear authority to borrow money upon the plaintiff's account. It cites Knickerbocker Trust Co. v. Davis (C. C.) 143 Fed. 587. But in that case each underwriter not only signed the agreement, but also a certificate promising to pay a specified sum at a day certain, and the agreement provided that the managers might borrow from the Trust Company, or any other party, up to the aggregate amount of all said certificates, and guaranteed the repayment of said loan to the extent of the certificates signed by each underwriter and pledged as collateral. Also Knickerbocker Trust Co. v. Evans, 188 Fed. 549, 110 C. C. A. 347. But there was an accomplished syndicate. The subscribers had paid 5 per cent. on subscription and 15 per cent. on call. There was a clear authorization to borrow money and a guaranty of payment thereof, and

the exact extent of each subscription was fixed by the agreement, and there were no provisions for rejection or reduction of subscriptions or allotment of shares. Both cases are distinguishable from that at bar.

Of course, the money was not borrowed for the plaintiff, nor for his account. It was borrowed and used by Searing & Co., a large part of it in settlement of debts theretofore incurred by them, in connection with their previous relations with the Delaware & Eastern Railroad Company. Fifty thousand dollars was at once used to pay off a note for that amount to the Empire Trust Company, from whom the money was borrowed. The Delaware & Eastern Railway Company had not been formed. It had no contractor and no construction company. The right as expressed was to arrange for advances to be made from time to time "to the contractors or construction company that may hereafter be formed to build the said railroad." That looked entirely to the future, and it confined the use to be made of advances upon the security of the agreement to the payment of the contractors or construction company for the building of the new railroad. So that in my opinion the rule relied upon by the appellant as stated in Bank of Batavia v. N. Y., L. E. & W. R. R. Co., supra, has no application to the facts in this case.

[4] The Empire Trust Company had notice from the face of the agreement, and from the letter written to it by Searing & Co. upon which the loan was made, that the underwriting had not been completed —indeed, that Jermyn was the only subscriber; that construction work had not commenced; that a large amount of the money was to be used to pay past indebtedness to it; that the first payment of 25 per cent. had been waived; that it could not collect any payments from Jermyn itself; that the managers had the right to reject or reduce any subscriptions; and that there was no consideration for or mutuality in the syndicate agreement. It concededly took the instrument as collateral security, and the evidence shows that it has received other collateral therefor. At the time of the assignment of the instrument to it as collateral security it was nonnegotiable, a mere chose in action, and nonenforceable as against Jermyn by Searing & Co.; for the reasons outlined, namely, it had no consideration to support it, there was no mutuality of contract, it had been theretofore revoked, and it did not authorize the borrowing of money thereon. It therefore fairly fell, it seems to me, within the line of cases which held that a nonnegotiable chose in action in the hands even of a bona fide assignee is subject to all the equities available at the time of the assignment against the assignor. In Stevenson Brewing Company v. Iba, 155 N. Y. 224, 49 N. E. 677, the court held that a bona fide purchaser for value of a nonnegotiable chose in action takes it subject to all the equities existing between parties to the instrument, and also to the equities which third parties could enforce against the assignor.

In Central Trust Company v. West India Imp. Co., 169 N. Y. 314, at page 323, 62 N. E. 387, at page 390, the court said:

"It is further the settled law of this state, though a different rule prevails, not only in England, but in the federal courts and in some of the states, that

a bona fide purchaser for value of a chose in action takes it subject, not only to the equities between the parties, but also to latent equities in favor of third persons."

The appellant claims that at the interview at the Trust Company, when the subject of plaintiff's payment of his note for $85,000 was under discussion, he was informed that Searing '& Co. intended to borrow on his syndicate agreement. I think the finding of the Special Term to the contrary, and that at no time prior to March 4, 1908, nearly a year thereafter, was it made known that such a loan had been requested or had been made, was sustained by the proof.

We have carefully examined all of this enormous record and the voluminous briefs submitted. It is impossible within bounds to discuss in this opinion all the questions argued. We have considered them all, and have reached the conclusion that the judgment should be affirmed, with costs to the respondent. All concur.