WELLER and another, Respondents, vs. PHILLIP GROSS
REALTY COMPANY, Appellant.

*November 18, 1920—March 8, 1921.*

*Brokers: Performance of contract: When commission is earned:
Contract of sale not consummated: Statement by owner as to
commission: Waiver of performance by broker: Estoppel:
Unauthorized act of broker: Effect on commission.*

1. In order to entitle a broker to recover his commission he must
   establish that he had produced a purchaser who was able,
   ready, and willing to purchase the property on the terms
   specified by the owner.
2. Where brokers were employed to sell a ninety-nine-year lease-
   hold on terms stated in writing, which included conditions
   to conform to the present lease and to release the vendor from
   all liability and for the erection of a new building by the
   lessee, pending which a bond was to be deposited, an offer to
   purchase by the brokers' customer which contemplated no
   assignment of the lease until the new building was completed,
   and which required the vendor to remain the principal on all
   bonds, did not conform to the stated terms so as to entitle the
   brokers to their commission.
3. Brokers have earned their commission when the stated terms
   are accepted by their customer and the contract is closed; but
   they are not entitled to the commission where the stated terms
   were not accepted and the parties never agreed on other
   terms.
4. The owners' statement to the brokers that the latter had earned
   their commission, made when the owners believed the deal
   would be closed with the brokers' customer, expressed no in-
   tention by the owners to relinquish their right to resist pay-
   ment of the commission if the customer was not willing to
   take the property under the terms stated to the brokers, and
   therefore did not waive that right.
5. The statement made by the owners to the brokers while nego-
   tiations with the brokers' customer were still pending, that
   the brokers had earned their commission, does not estop the
   owners from resisting payment of the commission after the
   negotiations fell through, in the absence of a showing of any
   acts by the brokers in reliance on the statement.
[6. Whether the unauthorized acceptance in writing by the brokers
   of an offer which was not in conformity to the owners' terms
   is such a palpable breach of duty towards the owners as to
   preclude a recovery by the brokers, not decided.]

APPEAL from a judgment of the circuit for Milwaukee county: JOHN J. GREGORY, Circuit Judge. *Reversed.*

This action was brought to recover a commission claimed to be due the respondents. The action was tried to the court and a jury. After the evidence was in, both parties moved for a directed verdict; thereupon the jury was dismissed, and the court made findings of fact and conclusions of law, pursuant to which judgment was entered for respondents in the sum of $10,517.89, from which judgment the defendant, appellant here, appeals.

The appellant is a corporation and owned a ninety-nine-year lease with the Jacobs estate, lessor, covering land known as No. 126–128 Grand avenue, Milwaukee, upon which property a store building occupied by the Phillip Gross Hardware & Supply Company was located. The Jacobs estate is the owner of the fee. The lease was signed November 9, 1911, and the term commenced January 1, 1912, and ended December 31, 2010. The rentals were made January 1, 1912, to April 30, 1915, $5,000 yearly, and for the remainder of the term $13,000 yearly, and the lessee was required to pay taxes and assessments on both land and improvements and water rents, etc., from the date of the lease. The lessee was also required by the terms of the lease to erect a new building at a cost of not less than $100,000 and complete the same before January 1, 1920, and to give a bond in the sum of $50,000 for the erection of a new building, which bond was to be secured by real-estate mortgage, which real estate was subject to a first mortgage of $12,500, the lessee having the right to substitute other security satisfactory to the lessor. Prior to the razing of the present building for the purpose of erecting a new one, the lessee was required to deliver to the lessor an additional bond of $50,000.

The Jacobs lease in question does not prohibit subletting, but does provide that assignment may be made without the

consent of the lessor upon certain conditions, one of which
is the execution and delivery of a $50,000 bond to the lessor.
The Jacobs lease also provides for a $100,000 bond on the
destruction of the proposed new building.

For the appellant there was a brief by *Lawrence A. Ol-
well, Bernard V. Brady,* and *Olwell, Durant & Brady,* all
of Milwaukee, and oral argument by *Lawrence A. Olwell.*

For the respondents there was a brief by *Benjamin Poss*
and *Herbert E. Toelle,* both of Milwaukee, and oral argu-
ment by *Mr. Poss.*

The following opinion was filed January 11, 1921:

KERWIN, J. The appellant excepted to the findings of
fact, and the main controversy in this case turns on
whether the facts found by the court below are supported
by the evidence.

A great amount of testimony was taken in the case, much
of which had little bearing upon the questions at issue.
That an agency to sell the property in question was created
is not denied, but the vital question is, Did the plaintiffs
produce a person ready and willing to buy the property in
accordance with the terms of the agency?

1. The following facts appear to be established without
substantial dispute: The defendant, *Phillip Gross Realty
Company,* and the Phillip Gross Hardware & Supply
Company were corporations whose stock was owned by
Phillip Gross, his son, Arthur Gross, and his son-in-law,
Chas. E. Mueller, all residents of Milwaukee. The de-
fendant *Realty Company* owned as lessee a ninety-nine-year
lease upon a piece of property on the north side of Grand
avenue. The owners of the fee, lessors, were Jacobs and
others of Madison, and are referred to in the testimony as
the Jacobs estate, and the lease as the Jacobs lease.

In February, 1913, the hardware company occupied the
building on the property covered by the Jacobs lease and the

*Realty Company* desired to dispose of that lease.    The plaintiffs, *Weller* and *Brachman,* acted as agents for the *Realty Company* under the following contract of agency:

"Milwaukee, Wis., 1/14/14.
*"Mr. W. B. Weller,* City.

"Dear Sir:   We hereby agree to lease the premises known as 126 and 128 Grand avenue—42½ x 100 feet—on the following terms and conditions:

"Rent to be $16,500 net per year to us for the balance of the term of ninety-nine (99) years as per lease now on said premises, payable quarterly in equal instalments, rent to start upon possession of present building.   Conditions similar and to conform to present lease.   Your parties must immediately, upon possession, commence erection of new buildings to cost not less than $100,000.   During construction your people are to have an acceptable bond of $50,000 deposited with us until new building is erected.   Taxes for first year to be adjusted.

"This proposition must be closed on or before February 16, 1913.          Yours truly,

"Phillip Gross Realty Company,
"Phillip Gross, President.
"Chas. E. Mueller, Secretary."

The agreement of agency is referred to in the printed case as Exhibit 1.   Under the agency the plaintiffs sought to interest one Adolph Spiegel, who was in business in Milwaukee.   Verbal proposals were carried back and forth between the *Realty Company* and Spiegel, and during the negotiations the *Realty Company* consented to a reduction of rent to $16,000 net per year.

The plaintiffs went to Spiegel with some concessions, and Spiegel's lawyer drew an instrument which purported to accept the verbal terms and was signed in the name of the Public Drug Company, a corporation controlled by Spiegel, and contained a blank space and appropriate wording for acceptance by the *Realty Company*.   The plaintiffs took this writing to the *Realty Company* on February 15, 1913, and presented it together with a check of $1,000 which Spiegel

had given them to induce acceptance of a previous offer on his part. The following is a copy of the instrument of acceptance, referred to in the case as Exhibit 3:

"Milwaukee, Wis., February 15, 1913.
*"To the Phillip Gross Realty Company:*
Presented.

"Gentlemen: The undersigned accepts the proposition made on your behalf by *Mr. W. B. Weller* for the leasing of the premises known as 126 and 128 Grand avenue, Milwaukee, Wisconsin, and herewith delivers to *Mr. Weller* check for one thousand (1,000) dollars to bind the bargain. Rental to be sixteen thousand (16,000) dollars net per year during the term; term of lease to be for ninety-nine (99) years, commencing November 1, 1913, or before if you deliver possession after thirty days' written notice to that effect. One thousand (1,000) dollars herewith deposited with *Mr. Weller* to be applied toward the payment of the first month's rental; check to be held until form of agreements are agreed upon. Your present interest in the lease you have with Jacobs and Robbins dated the 9th day of November, 1911, to be assigned to the undersigned no later than January 1, 1919. On delivery of possession, twelve thousand five hundred (12,500) dollars to be deposited with you to be held in trust until after the completion of the building, which is to be erected before January 1, 1920; you to pay five (5) per cent. interest per annum on such sum of $12,500 from the time of its deposit, semi-annually, and the said $12,500 to be applied on the first year's rental after the completion of the said building.

"Taxes and insurance to be adjusted and prorated, lessee only to pay for the proportion of the year after possession.

"Lessee shall have the privilege of making repairs and alterations, and doing all things in connection therewith as if he were the owner of the present building.

"Yours, etc..
"PUBLIC DRUG COMPANY,
"By Adolph Spiegel, President."

When this instrument, Exhibit 3, was presented to the officers of the *Realty Company* they refused to consider it until their attorney, Mr. Baker, had been consulted. After

Mr. Baker examined it he declared it too indefinite to warrant acceptance and advised that some instrument covering all the obligations to be assumed by each party should be executed. Mr. Baker, defendant's attorney, stated he could not do it that day, and it was suggested by *Mr. Weller,* plaintiff, that Mr. Gold, Spiegel's attorney, might do it. It was finally left to Mr. Gold to draw the paper.

On February 18, 1913, Mr. Gold submitted a draft of the proposed lease which did not meet the approval of Mr. Baker. Afterwards, on February 19, 1913, Mr. Baker submitted, at the solicitation of plaintiffs, a draft of a proposed lease, and on February 22, 1913, Mr. Gold submitted certain suggestions in the form of a letter, and on February 25, 1913, Mr. Gold and Mr. Glicksman submitted proposals with modifications. The matter of agreeing on "the form" of the lease or transaction had been left by the parties with their attorneys.

Nothing further seems to have been done by the parties to agree upon "the form" of lease or transaction at that time. In the language of counsel, the negotiations "were in a state of suspended animation—still alive, but not actively pressed."

Rumors came to Mr. Spiegel that the defendant was negotiating with other persons, whereupon Mr. Gold commenced an action for specific performance in favor of Mr. Spiegel and filed notice of *lis pendens.* While the specific performance action was pending Mr. Baker suggested that they continue negotiations, and drew and delivered to Mr. Gold a proposed escrow agreement, and assured Mr. Gold of the continued willingness of the *Realty Company,* defendant, to carry out in good faith the terms it had given to Spiegel.

Thereafter on January 9, 1914, Mr. Gold, without notice to Mr. Baker or the defendant, withdrew the specific performance suit and refused to resume further negotiations with the defendant or Mr. Baker unless the defendant would give his client an option for a definite period, so that his

client might go East and consult other parties whom he
might wish to interest in the deal. This ended negotiations
in the matter, and the defendant *Realty Company* was left
with the lease on its hands.

After the day on which plaintiffs obtained the proposal
from Spiegel the plaintiffs endeavored to hurry the matter
along and made an effort to get Mr. Gold and Mr. Baker to
conclude the deal, and in discussing the situation with the
officers of the *Realty Company* the plaintiffs were told in
effect that they had nothing to worry about; that they had
earned their commission and the matter was up to the attor-
neys to be worked out.

After the specific performance action had been instituted
Mr. Gold examined the plaintiff *Weller* as to what he would
testify to in that suit, and *Mr. Weller*, without authority
from the *Realty Company*, took the proposal of Spiegel (Ex-
hibit 3) heretofore referred to, and indorsed thereon the
following acceptance: "We agree to the foregoing. *Phillip
Gross Realty Co., by William B. Weller*, Agent," and de-
livered it to Mr. Gold, who retained it for the purpose of the
specific performance suit. *Mr. Weller* admits that he had
no authority to make this acceptance, and it will be observed
from an examination of Exhibit 1, hereinbefore referred to,
that said Exhibit 1 conferred no authority on plaintiffs to
make a sale on the proposal of Spiegel. Under the agency
contract with plaintiffs they were only authorized to make
the sale with similar conditions to those contained in the
Jacobs lease. True, there were one or two concessions made
by the defendant to *Weller* during negotiations; for ex-
ample, the rent was changed from $16,500 to $16,000, and
probably one or two other slight modifications. But the
contract between plaintiffs and defendant as finally settled
and agreed under the undisputed facts in this case was as fol-
lows: Rent, $16,000 per year; term of the sale, entire
balance of the ninety-nine-year lease; $50,000 building bond
put up by defendant to remain for Spiegel's benefit; $12,500

cash deposit to be made and applied on first year's rental after completion of building; transfer to be made subject to all terms and conditions of the Jacobs lease, which were to be assumed by whoever took the lease; and the *Realty* *Company* released from all obligations thereof.

2. The vital question is whether Spiegel, who was, so far as this case is concerned, the Public Drug Company, was ready and willing to accept the terms specified by the *Realty* *Company*. In order to entitle the plaintiffs to recover here it was necessary for them to establish that they had produced a purchaser able, ready, and willing to purchase the property on the terms specified by the defendant, and the clear preponderance of the evidence in the case establishes the fact that Spiegel (the Public Drug Company) was not ready and willing to accept the terms specified by the *Realty* *Company,* and never did consent to carry out the deal on such terms. In fact there is little dispute in the evidence on this proposition.

The authority of plaintiffs to dispose of the defendant's interest in the lease was specified in writing and is set out in the case as Exhibit 1. The proposal which the Public Drug Company made was not in compliance with the terms specified by defendant, and these specifications, except in the particulars heretofore mentioned, did not comply with the authority conferred on the plaintiffs.

It appears from the clear preponderance of the evidence that the terms which Spiegel failed to assent to were those which the *Realty Company* and the plaintiffs agreed on as the terms fixed by the *Realty Company* on which it would deal. This plainly appears from the objections which Mr. Baker, attorney for the *Realty Company,* raised to the proposed lease drafted by Mr. Gold, attorney for Spiegel. Mr. Baker's objections were substantially as follows:

(1) Gold's draft contemplates no assignment of the lease until after the new building is erected. Baker objected to this because the terms the *Realty Company* had fixed, as

recognized in Spiegel's written acceptance, were that the assignment was to be made prior to January 1, 1919, which was before the erection of the new building.

(2) Gold's draft, being merely a sublease until the new building was completed and providing for an assignment to Spiegel thereafter, did not release the *Realty Company* from its obligations or responsibilities under the Jacobs lease.

(3) Gold's draft was a mere contract to take an assignment of the lease by Spiegel in the future, not a present assumption of the obligations.

(4) Gold's draft provided no means of securing under the leasehold estate the $3,000 per year due defendant in excess of rental to Jacobs with the assignment of the lease.

(5) Gold's draft required the *Realty Company* to be the principal upon all bonds required by the Jacobs lease on assignment of the lease or wrecking of the old building, and left Spiegel an option to furnish sureties on the bond or put up securities in lieu of sureties.

(6) Gold's draft provided for an immediate assignment of the lease to a trust company pending erection of the new building. Baker objected to this. In his opinion no assignment could be made except upon compliance with the Jacobs lease by putting up $50,000 bond.

It appearing that the Gold draft of lease did not accord with the terms the defendant had given *Weller* and which Spiegel claimed to have accepted, Baker drafted and submitted, at the request of *Weller,* a form of sublease which called for a term one day short of the ninety-nine-year term. Baker, however, subsequently had stated that after careful consideration he was convinced that this sublease would probably be considered an assignment and thus necessitate the bond required by the Jacobs lease on assignment prior to completion of building.

In his testimony Gold admitted that he insisted on the defendant remaining as principal on the assignment bond, and it seems that practically all the evidence of Mr. Gold

is to the effect that he required the defendant to be principal upon all bonds.

The testimony shows quite clearly that included in the terms which the *Realty Company* gave to the plaintiffs to dispose of the lease was that the lease must be taken off their hands entirely, and plaintiff *Weller* admits that he understood that his agency agreement required him to dispose of the *Realty Company's* entire interest in the lease, and Spiegel's acceptance purported to accept the terms the *Realty Company* had given plaintiff *Weller;* but Spiegel, while accepting the terms given to *Weller,* insisted upon conditions inconsistent with those the *Realty Company* had given *Weller.*

Mr. Gold was acting for Mr. Spiegel, and, while it is true there is some evidence on his part to the effect that Spiegel would adopt some conditions in addition to those set out in his proposal, in the same breath Mr. Gold testifies that he was acting for Spiegel and that his instructions would be followed by Spiegel in the matter of what the agreement should contain. The terms which Mr. Gold insisted upon to the last were in conflict with the terms fixed by the *Realty Company.*   For example:

(1) Delay in assignment to Spiegel until completion of new building.

(2) Failure to provide immediate assignment to Spiegel and release of the *Realty Company.*

(3) Agreement by Spiegel to accept a future assignment *in præsenti.*

(4) Moneys due the *Realty Company* not secured on leasehold.

(5) Insistence that the *Realty Company* become obligated as principal on all future bonds.

(6) Provision for immediate assignment of the lease to a trust company, with no attempt to comply with terms of the Jacobs lease as to assignment.

The evidence all through, without any substantial dispute,

shows that Baker, on behalf of the *Realty Company,* endeavored to go as far as possible to comply with any reasonable demand made by Gold on behalf of Spiegel, for the purpose of bringing about a settlement of terms and conditions of the agreement upon which Spiegel might purchase. .

The changes which Mr. Gold demanded from the authority conferred on the plaintiffs by the *Realty Company* were broad and sweeping, and in a case like the present, where the lease was to extend for so long a period and involved so many and such important and complicated questions, could not reasonably have been assented to and were not within the terms of the agency.

The giving of the $50,000 assignment bond and the matter of the *Realty Company* binding itself to become principal upon all bonds, and which were insisted upon by Mr. Gold to the last, alone are sufficient to show that the plaintiffs had not found a purchaser ready and willing to carry out the terms of the Jacobs lease and that Spiegel was not ready and willing to deal upon the terms the *Realty Company* had authorized *Weller* to make.

The action of Spiegel, through Mr. Gold, in commencing the specific performance suit on the strength of some alleged rumors of other parties being after the property, and the sudden discontinuance of such suit without notice until after he was out of court and all costs paid, was also a rather unusual circumstance, especially when the discontinuance of this suit was followed by a demand for an option to purchase the property and refusal to resume negotiations on any other basis.

It is not necessary to speculate as to why this unusual proceeding was taken. It is simply in line with many other proceedings in the case, some of which it is not easy to understand. It is true that notwithstanding Mr. Gold's persistent demands respecting this assignment bond, and other conditions, he had on one or two occasions during the trial stated in a general way that he thought or believed

that Spiegel would comply with the defendant's proposition.

There is also some evidence on the part of *Mr. Weller,* plaintiff, to the same effect; but when we come to consider this evidence in connection with all the evidence in the case, it is perfectly clear to the court that the great overwhelming weight of the evidence is to the effect that Mr. Spiegel never was ready and willing to take the property in accordance with the terms of the agency.

The good faith of the *Realty Company* in endeavoring to carry out the deal according to the terms of the agency first created, and even by going further and making some concessions, is manifest from the whole record, even while the specific performance action was pending.    Mr. Baker, representing defendant, in a letter to Mr. Gold said, among other things:

"We believe that the parties should continue negotiations which were pending between them at the time the action was commenced, and that our client should give to your client a lease which would carry out as nearly as can be the understanding between the parties, which we insist had not yet reached the stage of an agreement."

Shortly after the receipt of this letter Mr. Gold discontinued the specific performance suit.

The whole record shows that Mr. Baker, representing the defendant *Realty Company,* made every effort that he reasonably could, under the contract between plaintiffs and defendant, to meet the demands of Mr. Gold, Spiegel's representative.    The testimony shows that Baker took the affirmative in attempting to bring about an agreement, and went to Gold's office for that purpose, while Mr. Gold says that he never was in Baker's office on the matter.

*Mr. Weller* gives some evidence that Mr. Spiegel will do so and so.    This evidence also is simply the opinion of *Mr. Weller* at best, and when we get down to the positive

testimony on the particular issues we find that the evidence
is practically all against that theory, and to the effect that
Spiegel and the defendant never agreed on the exact terms
upon which Spiegel would take the property.

Considerable is made of the point that something was said
to the effect that the plaintiffs need not worry, they had
earned their commission, and that the deal was closed and
nothing remained but to draw the formal contract. It is
quite apparent that the plaintiffs and defendant did not
fully understand the difference between the form of the
lease and the terms. Of course, if the contract had been
completed in its terms in every particular and nothing
further left to be considered, no question having arisen as to
whether the minds of the parties had met on the terms of the
contract, there might be some force in the plaintiffs' position
that their commission was earned when the contract was
closed; but the difficulty in the present case is that the
contract never was closed, according to the great preponder-
ance of the evidence.

It must be considered that the remark with reference to
plaintiffs having earned their commission was made on
the theory that the deal would be closed. It is argued by
respondents that the assurance coming from the defendant
that plaintiffs need not worry and that they had earned their
commission operates as a waiver of the defendant's right
to insist on performance of the contract, and that the de-
fendant is estopped from denying that the plaintiffs had
earned their commission. This contention is without merit.

In order to bind the defendant on the ground of a waiver
there must be, under repeated decisions of this court, in-
tentional relinquishment of a known right, and it seems
clear on the record that there was no intention on the part
of defendant to relinquish the right to resist payment of
commission in case the plaintiffs did not find a purchaser
ready and willing to take the property under the terms of the

agency. *Dunn v. Superior,* 148 Wis. 636, 135 N. W. 145; *Monroe W. W. Co. v. Monroe,* 110 Wis. 11, 85 N. W. 685; *Swedish Am. Nat. Bank v. Koebernick,* 136 Wis. 473, 117 N. W. 1020.

Nor can there be an estoppel against the defendant asserting its rights on account of such remark. In order to constitute an estoppel the party relying thereon must show that he has acted or failed to act to his present disadvantage; has on account of such reliance or failure to act altered his position for the worse. There is no evidence sufficient to support a finding of waiver or estoppel in this case.

In the instant case the parties to the negotiations for the sale were represented by two very able lawyers of Milwaukee, Mr. Spiegel by Mr. Gold and the defendant *Realty Company* by Mr. Baker, and the matter of formulating the contract very carefully considered. Not only the form of contract but the rights, liabilities, and burdens of the parties were considered.

3. It is further contended by appellant that the plaintiff *Weller,* by deliberately and without authority signing the name of his principal, the *Realty Company,* defendant, in acceptance of Spiegel's written proposal after the specific performance action was instituted and delivering the same to Spiegel's attorney for the purpose of that suit, committed a gross and palpable breach of duty to the defendant, which, aside from all other considerations, precludes a recovery in this action. This contention is vigorously presented in the brief of counsel for appellant and many decisions of this court are cited, amongst others the following: *Sicklesteel v. Edmonds,* 158 Wis. 122, 134, 147 N. W. 1042; *Sterling E. & C. Co. v. Miller,* 164 Wis. 192, 196, 159 N. W. 732; *Arthur Koenig Co. v. Graham G. Co.* 170 Wis. 472, 474, 175 N. W. 814, 815; *Weinhagen v. Hayes,* 174 Wis. ——, 178 N. W. 780, 183 N. W. 162.

In the view we take of this case it is unnecessary to pass upon this contention and we express no opinion upon it.

It follows from what has been said that the judgment of the court below must be reversed.

*By the Court.*—Judgment of the court below is reversed, and the cause remanded with instructions to dismiss the complaint.

A motion for a rehearing was denied, with $25 costs, on March 8, 1921.